[L.A. No. 29779. In Bank. Jan. 25, 1971.]

DAVID C. TARDIFF, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

David C. Tardiff, in pro. per., for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

OPINION

THE COURT.—This is a proceeding to review a recommendation of the State Bar that David C. Tardiff be disbarred. Petitioner does not challenge the findings of the State Bar Disciplinary Board but contends only that the discipline imposed is too severe.

Petitioner was admitted to practice in 1963; there have been no prior disciplinary proceedings against him. Upon graduation from law school, he was employed for a year and a half as a prosecutor. Thereafter, he went to work for another attorney, later leaving that employment to open his own office. The misdeeds which formed the basis for the State Bar's recommendation of disbarment occurred during the period he maintained his own offices.

According to the findings, during 1967 and 1968 petitioner failed to report his receipt of drafts in settlement of his clients' claims, forged their names to the drafts, commingled the proceeds, and misappropriated the funds to his personal use. He repeatedly denied to his clients that he had received money on their accounts. This course of misconduct involved six clients represented by petitioner in separate matters.

The findings are as follows: In February 1967 petitioner represented Joshua P. Farr, Jr., in a personal injury action. The matter was settled in that month for $3,000, and petitioner promised Farr that he would receive $2,000 from the settlement and that any costs and attorney's fees would be charged against the remaining $1,000. On February 27, 1967, Farr signed a release, and the insurance company issued its draft in the amount of $3,000 in favor of Farr and petitioner. Without reporting the receipt of the draft to Farr, and without authority from him, petitioner endorsed Farr's name to the draft. He commingled the proceeds with his own funds and converted them to his own use. Between February 27, 1967, and November 15, 1967, Farr attempted numerous times to ascertain if the check had been received and petitioner repeatedly informed him that it had not. Finally, Farr's brother discovered through the insurance company that petitioner had in fact received the money. When petitioner learned that the Farrs were aware of his receipt of the draft, he stated that he would "make it good" and that he did not wish the matter to be reported to the

State Bar. Farr informed the State Bar of petitioner's misconduct and thereafter petitioner paid Farr the money due him.

Petitioner represented Nicholas Greenwald in a personal injury action and, with Greenwald's consent, settled the claim for $1,750. Greenwald signed a release on February 22, 1967, and the insurance company issued a check in that amount payable to Greenwald and to petitioner as his attorney. On February 23, petitioner told Greenwald it would take ten days to two weeks for Greenwald to receive the draft, although petitioner already had it in his possession. Petitioner without authorization signed Greenwald's name to the draft, and deposited it in his trust account after withholding $50 for his own use. He converted the proceeds and did not report receipt of the draft to his client. Greenwald attempted five or ten times to ascertain whether the settlement monies had been received, and petitioner told him that they had not and that he was having trouble getting the draft from the insurance company. Greenwald repeatedly demanded the proceeds, but petitioner refused to remit the money to him.

Another client in a personal injury matter was Mrs. Martha M. Miller. On March 27, 1967, petitioner settled her claim for $4,000 and Mrs. Miller signed a release. He told her that she would receive $3,000 from the settlement and that he would retain $1,000 as his fee. The insurer issued its check to Mrs. Miller, petitioner signed her name without authorization,[1] and he failed to report the receipt of the funds to his client. In April, May, July, and August of 1967, petitioner falsely represented to Mrs. Miller that the settlement monies had not been received. He commingled the proceeds of the draft with his funds and converted the money to his own use. In July, petitioner told Mrs. Miller that although he had not received the money he would advance her $200. He issued a check in that amount to her but it was returned by the bank for lack of sufficient funds and has never been paid.

Petitioner represented Mrs. Ida G. Hebert in a personal injury action. In May 1967 he settled the case for $500 without notifying his client, and without her authorization signed her name to a check in that amount made payable to his client and himself, deposited the check, commingled it with his own funds, and converted the money to his own use. For several months thereafter, Mrs. Hebert and her husband telephoned petitioner to ascertain the status of the case, but he refused to return their telephone calls

---

[1]Petitioner denied signing Mrs. Miller's name to the draft. Apparently the attorney by whom petitioner was formerly employed, and who originally represented Mrs. Miller in the action, had authority to sign Mrs. Miller's name. Although the record contains no specific evidence to that effect, it may be that Mrs. Miller's name was signed by petitioner's former employer.

and failed to report the fact of settlement and the receipt of the draft and its proceeds. He falsely represented to Mrs. Hebert's husband approximately four months after receipt of the draft that the case had not been settled. Thereafter, Mrs. Hebert's husband discovered that petitioner had received the draft and cashed it, and he demanded the proceeds from petitioner, who falsely stated that the check must have been cashed by another attorney. Petitioner remitted $350 to Mrs. Hebert after she had lodged a complaint against him with the State Bar.

In the latter part of September 1967 petitioner represented James V. Tedesco to collect monies due Tedesco under a medical insurance policy. Petitioner and Tedesco agreed that the claim should be compromised for $500, $333.33 of which would be paid to a doctor for medical services rendered, and the remainder retained by petitioner. On October 9, 1967, the insurance company issued a settlement draft for $500, payable to Tedesco and petitioner as his attorney. Petitioner signed Tedesco's name to the check without authorization, commingled the proceeds with his own funds, and converted them to his own use. Despite repeated demands he failed and refused to pay the doctor any portion of the proceeds.

The final impropriety with which petitioner is charged occurred in August 1968. Petitioner represented Miss Betty Mae Peterson in a personal injury action. After a jury trial, a verdict was returned in her favor in the amount of $3,100. On August 19, 1968, the insurance company issued a check in that amount payable to her and to petitioner as her attorney. On August 22, without his client's authorization, petitioner signed her name to the draft, deposited $1,600 of the proceeds in his trust account, and retained $1,500 for his own use without authorization of his client. He did not report receipt of the draft to Miss Peterson and falsely represented to her that the money had not been received. He wilfully commingled the proceeds of the check with his own funds and distributed no part of the proceeds to her.

Petitioner did not appear for the hearings at which evidence to support the charges against him was received. After the recommendation of disbarment was made by the local committee, he requested permission to present evidence in mitigation of the committee's recommendation. He appeared before the State Bar Disciplinary Board and testified as follows: At the time he opened his own office he went heavily into debt. His wife was pregnant and gave birth to twins, and as a result of medical complications the children required hospitalization for about a month. He purchased a home at this time and was faced with mounting financial problems. His practice brought him a net income of $8,000 or $9,000 a year, and he was required to

borrow money to make his house payments and to pay the hospital bill and other expenses. He did not realize until too late that in private practice an attorney's income fluctuates and he was not prepared for the financially lean months which occurred.

When the financial pressures became too great, he would use funds received on behalf of clients, with the belief that his financial situation would soon improve and he could repay the money he had misappropriated. He would attempt to use the money he had taken from one client to pay another and, during this process, he candidly revealed, he used for his personal benefit money of clients other than that of the six who testified at the disciplinary hearing. These six "were the ones when you finally reach the end, you cannot pay anymore . . . but there are many before then that were paid and . . . you [the board] did not hear about."

Ultimately petitioner realized that he should not be in private practice but should obtain a job with a steady income, but by then it was too late because he was involved in a vicious circle of taking the money due one client to pay another. Although he realized that the circumstances which caused his financial difficulties were of his own making and that his conduct had been reprehensible, he testified that he would not commit such acts again, and he felt that disbarment was too severe a penalty in view of the fact that he had not been previously disciplined.

Petitioner stated during his testimony that he was ready to make restitution in the Tedesco matter, that he could repay Mrs. Miller in seven days, and that he would make full restitution to all his clients within three months.

The local administrative committee concluded that petitioner should be disbarred because he had intentionally engaged in misrepresentation and deceitful conduct, had commingled his clients' funds with his own and converted them to his own use, engaged in forgery, defrauded his clients, wilfully violated rule 9 of the Rules of Professional Conduct of the State Bar of California[2] as well as various provisions of the Business and Professions Code,[3] and that his actions involved moral turpitude and dishonesty. The findings of fact of the committee were approved and adopted by the State Bar.

---

[2]Rule 9 requires an attorney to promptly report to his client the receipt of money belonging to the client and forbids him from commingling his clients' money with his own.

[3]Petitioner was found guilty of violating section 6128 of the Business and Professions Code, which provides that an attorney is guilty of a misdemeanor if he is guilty of deceit with intent to deceive a party or wilfully receives money which he has not become answerable for. Section 6103 of the code, also found to have been violated by petitioner, states that any violation of an attorney's oath and duties may cause disbarment.

Petitioner pleaded guilty in criminal court to charges of forgery and grand theft in connection with the Peterson matter, and on October 22, 1970, this court suspended him from the practice of law because of his conviction of crimes involving moral turpitude.

In his petition for a writ of review petitioner avers that he has made restitution in the Greenwald and Hebert matters and that he paid Farr the money owed him prior to notification of State Bar proceedings. It should be noted, however, that the testimony indicates that petitioner did not make restitution to Farr until Farr's brother had threatened to file a complaint with the State Bar and then had done so. Petitioner also asserted that he would make restitution in the Tedesco, Miller and Peterson matters by October 1970. We have not been advised that restitution has in fact been made.

The record reveals a pattern of at least five forgeries, misappropriation of funds, and numerous acts of deceit and other dishonest conduct. Petitioner admits that this type of conduct occurred with respect to other clients to whom he was able to make restitution before complaints were filed with the State Bar.

While it appears that petitioner has attempted to make restitution to his defrauded clients, it has been said that "restitution where made under the pressure of a disciplinary hearing, and where there has been no prior offer of repayment or accounting, is entitled to no weight." (*Simmons* v. *State Bar* (1969) 70 Cal.2d 361, 366 [74 Cal.Rptr. 915, 450 P.2d 291]; also see *Cutler* v. *State Bar* (1969) 71 Cal.2d 241, 253-254 [78 Cal.Rptr. 172, 455 P.2d 108].)

We stated in *In re Smith* (1967) 67 Cal.2d 460, 464 [62 Cal.Rptr. 615, 432 P.2d 231], a case involving a repeated and continuous pattern of serious offenses, including habitual misuse of trust funds, that "Misappropriation of funds entrusted to an attorney at law is a gross violation of general morality as well as professional ethics and, in addition, *is likely to endanger the confidence of the public in the legal profession. It deserves severe punishment.*" There can be no doubt that this petitioner's misdeeds involved moral turpitude and warrant disbarment. The fact that he was under financial pressures is not sufficient to constitute mitigation. (*In re Smith, supra,* 67 Cal.2d 460, 464.) The board's findings and recommendations are fully supported by the record and are therefore approved.

It is ordered that petitioner be disbarred and that his name be stricken from the roll of attorneys, effective 30 days after the filing of this decision.