[L.A. No. 30311. In Bank. Mar. 7, 1975.]

FRANK J. MAGEE, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Herman Isman for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be suspended from the practice of law for a period of two years.

Petitioner was admitted to practice law in this state in January 1966. He has no prior record of discipline.

In January 1970, petitioner was employed to represent Norma Iovine in a proceeding for dissolution of marriage. Ms. Iovine had been represented prior to that time by another attorney, Michael Godett. During the time Godett was handling the matter, he employed on behalf of Ms. Iovine an investigator, John H. Eppick.

There was a great deal of controversy over the terms of the property settlement to be effected between Ms. Iovine and her then husband, Dr. Gino Iovine; but by August 1970 negotiations had proceeded, with petitioner's participation, to the extent that it appeared that a settlement could be agreed upon, provided a compromise was made with respect to attorney's and investigator's fees. Godett was claiming additional fees and costs of $6,500 due his firm, while Eppick was claiming fees and costs of $10,500.

Petitioner testified that his original agreement with Ms. Iovine was that he was to be paid $50 an hour for his time. That was the arrangement she had apparently had with Godett. Prior to the time petitioner began to represent Ms. Iovine, the trial court had awarded her $3,000 in attorney's fees, which Dr. Iovine had paid to her and which she, in turn, paid to Godett or his firm. Petitioner testified that the arrangement with him was that he was to be paid $50 an hour and that if the entire amount was not forthcoming from Dr. Iovine, Ms. Iovine would pay any deficiency. Ms. Iovine, however, testified that it was her understanding that all the fees would have to be paid by Dr. Iovine.

At the time Ms. Iovine retained petitioner to represent her, he knew that she was not in a position to "write [him] a check as a retainer." On February 6, 1970, when he filed certain documents on her behalf in the dissolution proceeding, both he and she stated, among other things, under penalty of perjury, that she was without funds to pay for the support of her two children, herself, her attorney's fees, and court costs.

There is evidence that in a three-way conference telephone call with Godett and Eppick petitioner represented that in order to effectuate the settlement he, as well as they, would be required to take reduced fees; and petitioner indicated he would be reducing his total fee to $9,000. On this representation by petitioner, Godett agreed to settle his claim for $1,303, and Eppick finally agreed to accept $5,900 in settlement of his claim.

Jerome S. Billet, the attorney representing Dr. Iovine, prepared a formal property and marital settlement agreement. In addition to the family home (subject to encumbrances of record), the furniture and furnishings therein, a certain automobile, and personal effects in her possession, Ms. Iovine was to receive custody of the parties' two children, child support, 10 years of nonmodifiable spousal support, and $56,500 in cash and was to relinquish all claims to certain stock, the ownership of which was in dispute. Dr. Iovine was to receive all the parties' assets except those agreed to be transferred to Ms. Iovine and was obligated to pay all community debts.

The agreement specifically provided, among other things, as follows: "Said attorney [Billet] is further instructed to issue his Clients' Trust Account check, payable to [petitioner] in the total sum of $16,499.00 *in full satisfaction of the claims of [petitioner], John H. Eppick, Humphreys, Russell & McDonald [Godett's firm], and Michael Godett.* Said attorney is not authorized to release said funds to [petitioner] until such time as [petitioner] presents to Jerome S. Billet fully executed releases of all claims for fees and other demands signed and executed by *each* of the foregoing parties.

"Jerome S. Billet is further instructed to issue his Clients' Trust Account check in the sum of $56,500.00, payable to Norma Iovine in full satisfaction of [Dr. Iovine's] obligations hereunder, and to deliver said check to her or her attorney . . . ." (Italics added.)

Petitioner testified that before the property settlement agreement was executed, he went over it very carefully with Ms. Iovine, discussing every clause with her. He said that with respect to the paragraph dealing with the check for $16,499, he told her that he "was going to apply that check against the balance on [his] fees and that there would, in fact, be an additional balance."

The agreement was fully executed on August 19, 1970, and was approved by the superior court the following day. Petitioner obtained from Godett and Eppick the releases required from them under the terms of the property settlement agreement. At the time Godett and Eppick executed the releases, petitioner explained to them that there were insufficient funds in his account to cover the checks and that they would have to wait a few days until the checks he would obtain from Billet had cleared the bank.

On August 21, 1970, petitioner brought the releases to Billet and presented Billet with a letter from himself acknowledging receipt of Billet's trust check in the amount of $56,500 payable to Ms. Iovine and another trust check in the amount of $16,499 in settlement of petitioner's attorney's fees, as well as the fees of Godett and Eppick. In the letter, petitioner represented that he had paid Godett's law firm $1,303 and had paid Eppick $5,900 in settlement of their claims.

Petitioner's letter reads, in part: "This letter is to acknowledge receipt of your trust check in the amount of $16,499.00. The check is in full settlement of my attorneys [sic] fees, the attorney's fees of Mike Godett of Humphries, McDonald & Russell and the investigator, John Eppick of the Meek Agency. I assume the full responsibility for paying and represent that I have paid the law firm of Humphries, McDonald & Russell $1,303.00, and John Eppick of the Meek Agency $5,900, in full settlement of all fees and costs incurred in the subject action [Iovine v. Iovine]. [¶] I further acknowledge receipt of your trust check in the amount of $56,500.00, made payable to Norma Iovine, such check in full settlement of Gino Iovine's obligation to pay such sum to Norma Iovine." Billet regarded petitioner's letter as a release and thereupon gave him the two checks.

Billet testified that he recalled that about three weeks before the details of the settlement had been worked out, petitioner mentioned that the fee he was receiving was inadequate for the work he had done and that he intended telling Ms. Iovine that she would have to pay him an additional sum, but Billet said he felt it was of no concern to him. He also said that by the time the agreement was drafted there was no further discussion with respect thereto and that it was his opinion that petitioner had agreed to accept the fees set forth.

Petitioner deposited the $16,499 check in his *personal* account, and, after endorsing Ms. Iovine's check (which, it will be recalled, was payable solely to her), deposited that check in his *trust* account. Petitioner testified that his standard attorney-client retainer agreement contains an authorization for him to endorse checks received on behalf of the client and that Ms. Iovine had executed such an agreement. He admitted, however, that he had been unable to locate such an agreement signed by her. He also said that he had had her oral authority, given by telephone, to endorse the check in her behalf.

Ms. Iovine, on the other hand, said that she had not authorized

petitioner to endorse the check and that she would have come down to the office herself had petitioner indicated her endorsement was then required. Apparently, she thought that petitioner would advance the sums needed for the expenditures she had approved and that she would repay him when she cashed the check. She denied having signed a written retainer agreement with petitioner and said that the clear understanding was that he was to be paid $50 an hour but that all of his fees would have to be paid by Dr. Iovine, and that she considered that when the property settlement agreement was executed, it had been settled once and for all that all additional attorney's and investigator's fees then owing would be covered by the $16,499 check.

The checks petitioner gave to Godett and Eppick were drawn on his *trust* account, and in subsequent accountings petitioner showed that the amounts of the checks given to them were charged against the $56,500 payment received on behalf of Ms. Iovine as the cash due her in the settlement with Dr. Iovine.

Ms. Iovine had asked petitioner for advice for investing the funds to the best advantage, and he had suggested the purchase of TWA bonds. It was agreed that he would order them from Dean Witter & Company on her behalf, and he expended $39,685.62 to cover the cost thereof. He also paid, with Ms. Iovine's knowledge and consent, $925 as repayment of a bank loan, $2 to the county recorder, and $49.21 to the county for property tax penalties. These four items total $40,661.83. Seemingly, therefore, Ms. Iovine was entitled to a balance of $15,838.17. Petitioner, however, as hereinabove indicated, had paid Godett $1,303 and Eppick $5,900 from the trust account. In addition, he paid therefrom miscellaneous costs relating to the Iovine proceedings, totaling $1,099.20. These amounts total $8,302.20.

To Ms. Iovine's astonishment, petitioner on October 5, 1970, sent her a check for $4,913.37, instead of the substantially larger sum she had been expecting. Unless petitioner properly charged the $8,302.20 hereinabove referred to to Ms. Iovine, and unless, as contended by petitioner, he was entitled to charge Ms. Iovine additional fees, the balance due her would be the difference between $15,838.17 and $4,913.37, or $10,924.80. Petitioner testified, however, that in November 1970 he reached an oral "accord and satisfaction" with Ms. Iovine with respect to all funds disbursed, including his attorney's fees.

Since it had appeared so clear that all the attorney's and investigator's

fees, including all fees due petitioner, were to be paid from the $16,499 check given to petitioner (and Ms. Iovine testified that the settlement would not have been made except with that understanding), Ms. Iovine tried on numerous occasions to contact petitioner for an accounting. She testified that she called him many times and left word for him to return her calls, but that he returned only one of her calls and then indicated that he did not want to render an accounting in writing; that she then wrote him three letters, at least two of which were sent by certified mail, demanding an accounting; and that although in her last letter, dated December 14, 1970, she indicated that she considered she had no alternative but "to seek advice from the State Bar Association," petitioner did not respond. Petitioner testified that he telephoned Ms. Iovine in response to all of her telephone calls and letters.

After the State Bar contacted him the latter part of January 1971, petitioner by letter dated February 2, 1971, wrote to the State Bar itemizing his disbursements, showing, in addition to the payments hereinabove referred to (that is, payments for various costs and the payments to Godett, Eppick, Dean Witter & Company, and the bank), a payment to himself in the amount of $2,622.60 as the balance of fees due to him. He indicated in the letter to the State Bar that each of the disbursements had been approved by Ms. Iovine. He also enclosed a copy of a portion of Ms. Iovine's deposition, taken on June 26, 1970, in which she had indicated that she had a written agreement with petitioner with respect to his fees.[1]

On March 10, 1971, petitioner sent to the State Bar copies of billings allegedly sent to Ms. Iovine at various times between April 3, 1970, and September 1, 1970, as well as a copy of a letter allegedly sent to her October 5, 1970, with an itemization practically identical to the one sent to the State Bar on February 2, 1971. The billings show total charges by petitioner for fees of $22,059 and costs amounting to $184.90; and the statement dated April 3, 1970, shows the receipt of $2,000 under an order to show cause. Somewhat inexplicably, the September 1, 1970, statement, showing a balance due petitioner of $20,434.90, does not show a credit for the $16,499 check which petitioner had received on August 21, 1970, and had treated as part of the fees due him.

---

[1]Her testimony, however, is somewhat ambiguous. She testified: "Q. Do you have a written agreement [with petitioner] with respect to fees? A. Yes. Q. You do? A. I guess so. Do I, Counselor?"

As hereinabove pointed out, in these proceedings Ms. Iovine denied having signed a written retainer agreement with petitioner.

In any event, Ms. Iovine testified that she had not received any billings from petitioner until he came to her home some time after the preliminary hearing herein in March 1971 and handed her an itemized billing. The billing which he presented to her at that time was entitled "COSTS—IOVINE" and listed expenditures allegedly made on behalf of Ms. Iovine (the costs and payments hereinabove referred to, including the $4,913.37 payment made to Ms. Iovine on October 5, 1970), totaling $53,877.40. It would appear from this billing that since petitioner had received $56,500 on behalf of Ms. Iovine, at least the difference between that figure and $53,877.40 would have been due her at such time. That difference is $2,622.60, the amount which petitioner showed on his itemization to the State Bar in his letter of February 2, 1971, as the balance of the fees payable to him. He did not explain on the billing given to Ms. Iovine that he had charged an additional fee of $2,622.60 or offer any explanation of why he had paid $8,302.20, representing Godett's and Eppick's fees and further costs, from the $56,500 given as the cash settlement Ms. Iovine was to receive under the property settlement agreement.[2]

Furthermore, if petitioner's fees totaled $22,059, and both the $2,000 payment under the order to show cause and the entire proceeds of the $16,499 check were credited to his fees, the balance for his fees would be $3,560, not $2,622.60.[3] Petitioner had no satisfactory explanation as to how he had arrived at the $2,622.60 figure.

On November 8, 1972, Ms. Iovine, through new counsel, filed a verified civil complaint against petitioner in the superior court, charging him with conversion of $9,825.60 of her $56,500. On January 15, 1973, petitioner filed a verified answer thereto denying all allegations of wrongdoing. He alleged certain affirmative defenses and, in addition, filed a verified cross-complaint claiming that Ms. Iovine owed him $10,000 in fees, that she had agreed she was indebted to him in that sum, and that she had breached her contract to pay a $10,000 balance of attorney's fees and costs owing to him.

[2]In the letter of October 5, 1970, which petitioner allegedly sent to Ms. Iovine, he lists additional attorney's fees for himself as $2,612.60, instead of $2,622.60. This is no doubt due to the fact that the itemization in that letter shows $131.50 expended for certain transcripts, whereas in the billing given to Ms. Iovine after the March preliminary hearing (and in the February letter to the State Bar) the total expended therefor ($103.40 plus $18.10) appears as $121.50.

[3]If petitioner's fees and costs shown on the billings given to the State Bar are considered together (a total of $23,158.20), the balance due after crediting the $2,000 payment under the order to show cause and the entire proceeds of the $16,499 check would be $4,659.20.

Petitioner testified before the trial committee in these proceedings that prior to January 1971 he had received all fees he claimed had been owing to him by Ms. Iovine. He said that he had filed the cross-complaint in order to cover himself for the "reasonable value of services rendered and/or breach of contract" and because of case law to that effect. He referred to a certain case warranting such action on his part, but did not give a citation.

A week before the disciplinary board hearing herein, but after the trial committee had recommended that petitioner be suspended for three years or, in the alternative, for only two years if he made full restitution, petitioner made full restitution, paying Ms. Iovine $12,819.37, which sum included interest and costs.

Petitioner has the burden in this proceeding to show that the findings of the disciplinary board are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Younger* v. *State Bar,* 12 Cal.3d 274, 284-285 (1) [113 Cal.Rptr. 829, 522 P.2d 5]; *Walter* v. *State Bar,* 2 Cal.3d 880, 887 (2) [87 Cal.Rptr. 833, 471 P.2d 481].) Petitioner, however, has not met this burden.

■ The extensive documentary evidence received by the trial committee established by itself to a large extent that petitioner misappropriated his client's funds and practiced deceit upon her and upon other persons having claims for services rendered in his client's behalf, as well as opposing counsel and the State Bar. In addition, the trial committee saw and heard the testimony of seven witnesses, including petitioner, and unanimously found culpability. Significantly, the testimony of the witnesses for the State Bar was convincing and consistent with the documentary evidence, while petitioner's testimony conflicted with the documentary evidence, and part of it was implausible. Since the trial committee saw and heard petitioner and the other witnesses, this court will give great weight to its findings. (*Lewis* v. *State Bar,* 9 Cal.3d 704, 712-713 [108 Cal.Rptr. 821, 511 P.2d 1173]; *Ridley* v. *State Bar,* 6 Cal.3d 551, 559 [99 Cal.Rptr. 873, 493 P.2d 105].) Furthermore, the disciplinary board, following its independent review of the record, also unanimously found petitioner culpable.

Although petitioner eventually made full restitution, this fact does not entitle him to any special consideration, particularly since it was made under the pressure of civil litigation brought against him by his client and occurred only a week prior to the disciplinary board's hearing and

after the trial committee had unanimously recommended that petitioner be suspended for three years or, in the alternative, for only two years if he made full restitution. (See *Sevin* v. *State Bar,* 8 Cal.3d 641, 646 [105 Cal.Rptr. 513, 504 P.2d 449]; *Tardiff* v. *State Bar,* 3 Cal.3d 903 [92 Cal.Rptr. 301, 479 P.2d 661].)

In addition to his deception of his client, the other attorneys involved, and the investigator, petitioner, it will be recalled, filed false verified pleadings in the civil litigation brought against him by his client and, furthermore, was not candid when he testified before the trial committee. Under all the circumstances, the recommended discipline is lenient.

It is ordered that petitioner be suspended from the practice of law for a period of two years. It is further ordered that within 30 days after the effective date of this order petitioner shall perform the acts specified in rule 955, subdivision (a), California Rules of Court, and that within 40 days after the effective date of this order petitioner shall file with the clerk of this court, with proof of service of a copy on the State Bar at its San Francisco office, an affidavit containing the matters specified in subdivision (c) of the foregoing rule. This order is effective 30 days after the filing of this opinion.