[S.F. No. 23894. Mar. 6, 1979.]

JOHN L. WEIR, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

John L. Weir, in pro. per., and Samuel R. Gross for Petitioner.

Herbert M. Rosenthal and Magdalene Y. O'Rourke for Respondent.

**OPINION**

**THE COURT.**—We review recommendation of the Disciplinary Board of the State Bar that petitioner John L. Weir be disbarred. (Bus. & Prof.

Code, § 6083, subd. (a); Cal. Rules of Court, rule 952(a).) Such recommendation is grounded on independent courses of misconduct, including knowingly submitting false information to the United States Immigration and Naturalization Service; settling a client's claim without client's consent; and converting entrusted funds for his own use and benefit, as found by the disciplinary board.

Petitioner was admitted to practice in 1968 and has no prior record of discipline. He is charged with violation of his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067-6068, 6103), commission of acts involving moral turpitude, dishonesty and corruption (Bus. & Prof. Code, § 6106), and willful violation of former rule 9 of the Rules of Professional Conduct (currently rule 8-101, see 3B West's Ann. Bus. & Prof. Code, foll. § 6076; Deering's Cal. Codes Ann. Rules (1976 ed.) at pp. 625-626). The board found against petitioner as to such charges and additionally recommends he be required to make restitution of specified amounts.

The course of conduct resulting in culpability found by the board was engaged in by petitioner while serving as counsel to clients in four separate matters occurring during the period June 1971 to March 1975. Petitioner claims as to all counts the evidence is insufficient to support the board's findings and recommendations. He also claims as to all counts the proposed discipline is too severe in absence of a prior record of discipline. Other contentions pertain to particular counts and will be discussed in relation to pertinent charges.

## STATEMENT OF FACTS

I. ▮ *The Abellana Immigration Matter*

Petitioner was retained in June 1971 by Engelberto and Glenda Abellana to assist them and their children in obtaining permanent resident status in the United States. They had previously applied for such status, but their applications had been denied.

On February 9, 1972, Engelberto and Glenda were classified deportable and placed under departure order by the Immigration and Naturalization Service. Engelberto testified that after such classification, petitioner told them Glenda should obtain a Reno divorce based on false testimony as to their relationship. When the divorce became final both she and Engelberto would be free to marry American citizens, thereby avoiding deportation. Engelberto further testified petitioner assured them

as soon as their prospective new spouses could petition for and obtain in behalf of the Abellanas changes of immigration status based on the sham marriages, they could return to their former married life together.

A divorce was granted Glenda March 27, 1972. On April 27, 1972, both Engelberto and Glenda were married to American citizens.

Petitioner prepared and filed documents and applications with the Immigration and Naturalization Service for the purpose of obtaining permanent resident status for Engelberto and Glenda, alleging his clients and their new spouses were lawfully married. On June 19, 1972, petitioner's motions to reopen his clients' immigration cases were denied by the Immigration and Naturalization Service because of false testimony and false statements made in applications prepared by petitioner. The service later found the Abellanas had entered into fraudulent remarriages.

Petitioner denies knowledge of or reason to believe the marriages were fraudulent. He testified that after his clients were found deportable, he advised them to return to the Philippines.

The disciplinary board found on the foregoing record that the State Bar failed to establish by clear and convincing evidence petitioner advised or assisted the Abellanas with the sham procedures solely for the purpose of obtaining permanent resident status for his clients. However, the board found petitioner knew or should have known allegations in documents filed with the Immigration and Naturalization Service were false. Further, the board found petitioner was nonresponsive to questions and displayed a lack of candor in his testimony before the hearing panel.

In State Bar disciplinary proceedings we make independent findings of fact on review of the record, and exercise our independent judgment as to the discipline to be imposed. (See *Brotsky* v. *State Bar* (1962) 57 Cal.2d 287, 300 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310].) However, we accord great weight to findings of a hearing panel (see *Magee* v. *State Bar* (1975) 13 Cal.3d 700, 708 [119 Cal.Rptr. 485, 532 P.2d 133]) and the burden is on a petitioner to show that the charges are not sustained by convincing proof and to a reasonable certainty. (*In re Lyons* (1975) 15 Cal.3d 322, 325 [124 Cal.Rptr. 171, 540 P.2d 11]; *Vaughn* v. *State Bar* (1972) 6 Cal.3d 847, 852 [100 Cal.Rptr. 713, 494 P.2d 1257].)

█ We have considered petitioner's contention as to sufficiency of the evidence and are persuaded, based on the record before us, the charge arising out of the Abellana matter is supported by sufficient record evidence.

II. █ *The Huergas Immigration Matter*

Crispin and Zenaida Huergas retained petitioner on May 17, 1972, to represent them in obtaining permanent resident status. Petitioner made attempts to obtain the desired status for Crispin, but on December 7, 1972, the service ordered Crispin deported.

Zenaida testified petitioner advised her to divorce Crispin, marry an American citizen and, after she got her permanent status, divorce again and remarry Crispin. Zenaida thereafter arranged to marry Jesse Almanza. According to Zenaida, petitioner informed Almanza the marriage was to last only until Zenaida obtained permanent status.

On January 15, 1973, the Huergas divorce became final; Zenaida married Almanza that same day.

Petitioner then prepared and filed documents with the service, alleging Zenaida and her spouse were lawful husband and wife. Zenaida testified she paid Almanza $500, on petitioner's advice, to assure Almanza's cooperation in appearing with her at an Immigration and Naturalization Service interview. Zenaida was granted conditional permanent status after testifying she was then living with Almanza and she and Crispin had divorced because of long standing marital problems. She later acknowledged she had lied under oath in an effort to conceal from the service the sham nature of her marriage to Almanza.

During the course of further Immigration and Naturalization Service proceedings, it was disclosed Zenaida had suffered a prior felony conviction in the Philippines. Zenaida testified that petitioner advised her this fact was an obstacle to obtaining permanent resident status, and that they would have to "buy the trial attorney" in order to assure a favorable result from the service. Zenaida further testified that she paid petitioner a total of $1,100 for purported bribes of service employees, and that petitioner represented the money would be so used. There is no evidence petitioner paid money to immigration authorities, as bribes or otherwise.

As in the Abellana matter, the board found the State Bar had failed to establish by clear and convincing evidence petitioner advised his clients to obtain a divorce or advised Zenaida marry a United States citizen in order to obtain permanent resident status. However, the board found petitioner knowingly submitted a false application on behalf of Zenaida to the Immigration and Naturalization Service.

We are persuaded, based on the record before us, the disciplinary board made proper findings in the Huergas matter.

III. *The Abellana Personal Injury Matter*

Petitioner also represented Engelberto and Glenda Abellana under a contingency fee arrangement in a personal injury matter. The case arose from an automobile accident in 1970 in which both clients were involved. Petitioner settled their claims for $2,750.

Engelberto and Glenda denied having knowledge of or consenting to settlement of their claims. They testified they first knew their claims had been settled early in 1973 after they had retained a different attorney. Petitioner testified that he obtained consent to settle from both Engelberto and Glenda by telephone, and that they signed a release on February 8, 1973.

A handwriting expert testified signatures on the release and endorsements attached to the $2,750 settlement draft were not the genuine signatures of Engelberto and Glenda. He also testified the two signatures appearing on the release were "written over pencilled outlines of the same name." Petitioner notarized the release as having been signed by his clients.

The Abellanas further testified petitioner failed to report the settlement to them. According to bank statements, petitioner deposited the settlement proceeds in his trust account. Petitioner acknowledged he could not account for the funds.

Petitioner claims all proceeds from the settlement draft were due him as uncollected fees for legal service rendered to the Abellanas for immigration matters. However, the record shows the only amount owed by the Abellanas to petitioner at the time of settlement was his contingent fee in the personal injury action—$941.85.

The board found the following misconduct on petitioner's part: settling the personal injury claim without authority from or notice to the Abellanas; signing or causing to be signed the Abellanas' names on the settlement release and then notarizing the signatures; converting proceeds of the settlement draft to petitioner's own use and benefit without notice to his clients; and failing to keep proper books and accounts of trust funds received. The board further found petitioner affirmatively misrepresented to the panel the Abellanas had personally signed and endorsed the settlement agreements and drafts.

The board recommended petitioner be required to make restitution to the Abellanas in the amount of $1,808.15.

Based on the record before us, we are persuaded the findings are supported by clear and convincing evidence.

IV. ██ *The Goldstein Uninsured Motorist Matter*

On September 25, 1972, Afaf and Ojien Goldstein retained petitioner to represent them in an uninsured motorist claim against Allstate Insurance Company (Allstate). Petitioner negotiated with Allstate and, by a subrogation agreement dated October 2, 1973, settled the claim of $750 plus $313.95 for medical payments.[1] The agreement purports to have been signed by the Goldsteins.

In an effort to support his testimony that Afaf was present in his office at the time the settlement agreement was signed, petitioner submitted a photograph of Afaf and produced two witnesses who identified the person in the photograph as a woman they saw in petitioner's office on a day they were at the office. However, the witnesses repeatedly identified the pertinent date to be September or October 1974, while, as stated, the subrogation agreement is dated October 2, 1973, and Allstate drafts in payment of settlement amounts bear dates of September 19 and 20, 1973.

Afaf Goldstein testified she did not sign the settlement agreement and a handwriting expert confirmed the signatures on the pertinent documents were not those of Afaf.

---

[1]Petitioner testified he was authorized by Afaf Goldstein to settle the claim, during both an in-person conversation and a subsequent telephone conversation. Afaf denied petitioner was so authorized.

The Goldsteins further testified petitioner did not report the settlement to them until approximately one year after the settlement took place, at which time they had retained another attorney to pursue the claim. That attorney wrote to petitioner requesting the file on the accident case and sending a substitution of attorneys for execution. Petitioner did not respond to the request.

Petitioner testified he did not forward to the Goldsteins any of the settlement money or the money received for medical expenses. He alleged the money was owed to him for legal services rendered on immigration matters. However, according to petitioner's fee ledger sheet for the Goldstein account, the Goldsteins had paid all fees and costs owed petitioner for services in connection with immigration matters.

The first purported accounting of the settlement proceeds was submitted by petitioner during these proceedings in February 1975. Such accounting was later shown to be false.

The board found the following misconduct: settling the personal injury claim without authority from or notice to the Goldsteins, signing or causing to be signed Afaf's name to the subrogation agreement and two drafts from Allstate, converting settlement proceeds for petitioner's own use and benefit, and failing to furnish the Goldsteins with any purported accounting of settlement proceeds until the hearing in February 1975.

The board recommended petitioner be required to make restitution to Afaf in the amount of $813.95.

We are persuaded the disciplinary board's findings as to petitioner's culpability are sufficiently supported.

## DISPOSITION

 Petitioner claims as to all counts there is a lack of credibility of the complaining witnesses. When evidence presented to a hearing panel consists primarily of conflicting testimony, the panel's opportunity to observe and judge the credibility of witnesses constrains us to weigh heavily the testimony supporting the panel's findings. (See *Nizinski* v. *State Bar* (1975) 14 Cal.3d 587, 595-596 [121 Cal.Rptr. 824, 536 P.2d 72]; *Sampson* v. *State Bar* (1974) 12 Cal.3d 70, 74 [115 Cal.Rptr. 43, 524 P.2d 139].) In the instant case, several witnesses testified as to petitioner's various and repeated acts of misconduct. Such testimony

discloses a recurring pattern of misconduct, and we discern no reason to believe the testimony of the complaining witnesses to be collusive. Further documentary evidence supports the testimony of the complaining witnesses and, where applicable, their testimony is corroborated by handwriting experts. On the other hand, petitioner was found to be evasive and lacking in candor. We are persuaded there is ample evidence to support the board's findings as to credibility of the complaining witnesses.

■ Petitioner further contends as to all counts the board abused its discretion by summarily denying his motion for a continuance on March 7, 1977, one day before the then scheduled hearing date. Petitioner requested he be allowed an additional 90 days in which to complete discovery with respect to Immigration and Naturalization Service documents. Such documents, petitioner claimed, would have permitted him to establish that the testimony of the complaining witnesses, the Abellanas and the Huergas, was untrustworthy as having been improperly influenced by the Immigration and Naturalization Service, since the service could order the witnesses' deportation.

There were several continuances of hearings—some on motion of the State Bar and some on motion of petitioner—resulting in approximately 15 months of discovery prior to March 7, 1977. We are not persuaded that—as claimed by petitioner—the record before the hearing panel when the motion was denied, contains "strong indications" the undesignated and undiscovered documents petitioner sought could have substantiated his contention the service had coerced or otherwise had influenced the testimony of the complaining witnesses. Petitioner's motion was supported solely by declarations filed by his attorneys. The declarations are speculative and suggest only that petitioner proposed to embark upon a venture based only on hope. Even now petitioner does not advise of the nature of documentation of coercive acts the Immigration and Naturalization Service might have maintained or now maintains in its files. Based on the record the hearing panel did not abuse is discretion in denying the motion for a further continuance.[2]

■ Finally, petitioner contends even if the record supports the findings, the recommended discipline—disbarment—is excessive. He

[2]Petitioner does not here attempt to discredit the testimony of Mr. or Mrs. Goldstein, who were not involved with the Immigration and Naturalization Service. Their testimony—together with that of handwriting experts—establishes petitioner's culpability in settling a claim without clients' consent, converting the proceeds of such settlement, and forging and notarizing signatures on settlement drafts and releases.

asserts attorneys are rarely disbarred in the absence of a record of prior discipline unless they have been convicted of serious criminal offenses or were otherwise subject to criminal prosecutions.

Misappropriation of a client's funds is in itself a serious offense. In the absence of extenuating circumstances, disbarment is an appropriate discipline. (*Sevin* v. *State Bar* (1973) 8 Cal.3d 641, 646 [105 Cal.Rptr. 513, 504 P.2d 449]; see also *Allen* v. *State Bar* (1977) 20 Cal.3d 172, 178 [141 Cal.Rptr. 808, 570 P.2d 1226]; *In re Abbott* (1977) 19 Cal.3d 249, 254 [137 Cal.Rptr. 195, 561 P.2d 285]; *Resner* v. *State Bar* (1960) 53 Cal.2d 605, 612 [2 Cal.Rptr. 461, 349 P.2d 67].) Moreover, failure to keep proper books of account, vouchers, receipts and checks is a breach of an attorney's duty to his clients. (See *Clark* v. *State Bar* (1952) 39 Cal.2d 161, 174 [246 P.2d 1].) Finally, and perhaps most compelling, petitioner's repeated practices of forgery, fraud and deceit with respect to his clients and the Immigration and Naturalization Service is indicative of serious breaches of integrity, thus involving moral turpitude. (See *Allen* v. *State Bar, supra,* 20 Cal.3d 172, 178-179; *Codiga* v. *State Bar* (1978) 20 Cal.3d 788, 793 [144 Cal.Rptr. 404, 575 P.2d 1186]; *Sullins* v. *State Bar* (1975) 15 Cal.3d 609, 622 [125 Cal.Rptr. 471, 542 P.2d 631].)

Petitioner has shown no mitigating factors or extenuating circumstances justifying a lesser discipline than disbarment. On the contrary, the record demonstrates only aggravating circumstances. The disciplinary board found petitioner to be nonresponsive and lacking in candor in his testimony to the panel. Moreover, petitioner made affirmative misrepresentations during the disciplinary proceedings and demonstrates no remorse for his misconduct.

We of course exercise independent discretion in fixing appropriate discipline (*Greenbaum* v. *State Bar* (1976) 15 Cal.3d 893, 904 [126 Cal.Rptr. 785, 544 P.2d 921]), although we attach great weight to the disciplinary recommendations of the board. (*Inniss* v. *State Bar* (1978) 20 Cal.3d 552, 558 [143 Cal.Rptr. 408, 573 P.2d 852].)

It is ordered that John L. Weir be disbarred[3] from the practice of law in this state, and that his name be stricken from the roll of

---

[3]We do not deem it appropriate that—after ordering the ultimate discipline of disbarment—we further purport to condition that discipline, as by requiring restitution. Persons who have been wrongfully damaged by petitioner have their remedies at law, of course. Moreover, should petitioner in the future seek readmission to the State Bar, the matter of restitution would weigh heavily in demonstrating that petitioner has or has not been rehabilitated. (See Bus. & Prof. Code, § 6078; pt. IV, ch. 7, Rules Proc. of State Bar;

attorneys, effective 30 days after the filing of this opinion. It is also ordered that he comply with the provisions of rule 955, subdivision (a), California Rules of Court within 30 days of the effective date of this order and that he file an affidavit with the clerk of this court as provided in subdivision (c) of the rule within 60 days of the effective date of the order showing his compliance with said order.

see West's Ann. Bus. & Prof. Code, foll. § 6087; Deering's Cal. Codes Ann. Rules (1976 ed.) at pp. 690-696.)