[L.A. No. 31207. July 3, 1980.]

DAVID C. TARDIFF, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Mitchell W. Egers and Hanson & Egers for Petitioner.

Herbert M. Rosenthal, Gael T. Infande and Robert M. Sweet for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review the recommendation of the State Bar Court that petitioner David Tardiff be reinstated to the practice of law subject to a two-year probationary period with stipulated conditions pertaining to the handling of clients' funds. We conclude that petitioner should not be reinstated.

The two-member hearing panel in this proceeding filed a proposed decision recommending the unqualified reinstatement of petitioner. The examiner for the State Bar filed a statement in opposition to the pro-

posed decision and sought advisory review of it. The examiner claimed that the proposed decision portrayed an inaccurate and incomplete picture regarding the rehabilitation of petitioner. The examiner further suggested that if petitioner were to be reinstated it should be done conditionally, and he submitted a list of recommended conditions. This recommendation provided the substance of a stipulation in which petitioner agreed to accept the conditions stated in exchange for the examiner's agreement to withdraw his opposition and request for advisory review. The hearing panel approved the stipulation and, as stated, recommended reinstatement subject to a two-year probationary period.

Petitioner, age 44, was admitted to practice law in 1963. He was employed for a year and a half as a prosecutor in the city attorney's office of Los Angeles and thereafter went to work for another attorney. He later left that employment to open his own office. The misconduct for which petitioner was disbarred occurred during the period he maintained his own office. During 1967 and 1968 petitioner "failed to report his receipt of drafts in settlement of his clients' claims, forged their names to the drafts, commingled the proceeds, and misappropriated the funds to his personal use." (*Tardiff* v. *State Bar* (1971) 3 Cal.3d 903, 904 [92 Cal.Rptr. 301, 479 P.2d 661].) In connection with this activity, petitioner pleaded guilty to criminal charges of forgery and grand theft. At his disbarment proceedings petitioner testified that he converted the funds in order to alleviate financial pressures brought about by his attempts to portray a successful Beverly Hills lawyer, which were compounded by the necessity of expensive hospital care for his premature twins. On January 25, 1971, we entered our order disbarring petitioner.

In November 1978, petitioner sought reinstatement. At hearings held in May and June 1979, he presented evidence of his rehabilitation. Eight witnesses testified on his behalf, including five lawyers. Each lawyer attested to petitioner's rehabilitation and present learning in the law. Particularly informative was the testimony of Attorney Arthur Morganstern who has known petitioner since 1972. When he first knew petitioner, petitioner was depressed, immature and separated from his wife. Since 1974, Mr. Morganstern has observed both physical and emotional changes in petitioner. Petitioner lost weight, became interested in physical fitness, reconciled with his wife, became a more open person and less interested in material things. Mr. Morganstern believes that petitioner is now mature and trustworthy.

Dr. Ronald Markman, a psychiatrist who treated petitioner and his wife in 1972 and 1973 (and has seen petitioner on two occasions since) testified that petitioner had confused value judgments and difficulty organizing his lifestyle in 1972. He observed a great deal of improvement in petitioner during the year and a half of treatment and thinks that petitioner does not now possess the spendthrift and emotional habits that led to his disbarment. It was his opinion that petitioner is now a trustworthy person who is much more realistic in his thinking about financial problems. Dr. Markman thought that petitioner could handle being a lawyer now and that the potential for recurrence of petitioner's former behavior is "almost nonexistent."

Petitioner's wife testified that since his psychiatric treatment her husband has undergone gradual change to the point where they work together paying their bills. There has been a 100 percent improvement in their marriage and family life. Petitioner accepts responsibility for his prior misconduct and feels very badly about the harm he caused others. Mrs. Tardiff does not think that there is any likelihood that petitioner would do the same thing again; he is a different person now.

Petitioner testified that he has made restitution to all of his victims and that his only substantial remaining debts are loans from a relative and an acquaintance. He intends to repay these loans but has not been able to do so yet. Petitioner has kept up with the law and has recently taken and passed the Professional Responsibility Examination. Petitioner stated that he has a new self-image and that he no longer cares for the approval of more materialistic members of society. He asserted that he does not now spend money foolishly and that if he were ever to get into financial difficulty again, he would resolve his problems differently than before.

The evidence presented at the hearing also included testimony about a number of unfavorable matters. It is these matters that the State Bar examiner relied upon in opposing the hearing panel's proposed recommendation of unconditional reinstatement. These are matters which occurred within three to four years following petitioner's disbarment and include petitioner's delay in making restitution, his writing bad checks, obtaining loans under alleged deceitful circumstances, and unauthorized practice of law.

The State Bar examiner asserted that petitioner had a cavalier attitude toward restitution. During the disbarment proceedings petitioner stated that he could repay all six of his victims within three months. (*Tardiff* v. *State Bar, supra,* 3 Cal.3d at p. 907.) He now admits that he knew he could not do so; his claim to the contrary was part of his unrealistic and inappropriate conduct at the time. Most of petitioner's victims were not paid until two or three years later, and one of them was not paid until one week before the hearings in this matter.

The evidence in this case, in our view, does not support the conclusion that petitioner was unwilling to make restitution to his victims. Although complete restitution took several years, petitioner paid what he could afford to the probation office, which allocated particular amounts to the victims.[1]

Petitioner obtained a number of loans which he failed to repay within the time promised. In 1970, petitioner borrowed $4,000 from his wife's uncle, Mack Strahl. Petitioner failed to repay the loan as scheduled, and Mr. Strahl filed a complaint in 1971 alleging, inter alia, fraud based on petitioner's failure to provide a deed of trust on his home, which was to be the security for the loan. Petitioner testified that he did not take the fraud allegation seriously. He acknowledged that Mr. Strahl was to receive a deed of trust but contended that Strahl's agreement to make the loan was based on other considerations than the obtaining of a deed of trust.[2] Although the examiner concluded that petitioner acted dishonestly in dealing with Mr. Strahl and his attorney, attempted to conceal his whereabouts, and was not candid with the hearing panel regarding this matter, such a characterization appears to be an exaggeration of the testimony given. Petitioner admitted that he made little or no effort to stay in touch with Mr. Strahl, but there is no indication that petitioner purposefully attempted to conceal his whereabouts. Nor does petitioner's unsureness about certain details of the transaction necessarily indicate a lack of candor; it could also be a result of the passage of time and petitioner's distraction at the time with his numerous other financial problems.

---

[1]As to the victim who was only recently repaid, petitioner testified that he learned that this victim had not been included in the allocations made by the probation department only in 1978 when he received a schedule of payments made by them. It then took him some time to track down the person, as there was no current address for him.

[2]The State Bar relies on the reference to a deed of trust in the promissory note given to Strahl in asserting that the deed of trust was always a part of the agreement. The record reveals that there are in fact two promissory notes signed by petitioner and his

In November 1973, petitioner borrowed $4,000 from Ms. Maria Arteaga, a client of his then employer, Attorney Jed Kelson. Petitioner proposed that Ms. Arteaga make him the loan while he was accompanying her to the bank to negotiate her $16,000 settlement check. He did not suggest that she seek advice of independent counsel, did not give her security for the loan and gave her a 60-day promissory note knowing that he could not repay the loan that quickly. Petitioner did not reveal his intentions to Kelson because he believed that Kelson would advise his client not to make the loan. Petitioner used the proceeds of the loan to make restitution to one of the victims in his disbarment proceeding in order to clear up her lawsuit against him so that he could proceed with the pending purchase of his house. Ms. Arteaga was not repaid until 1977, after she had filed an action against petitioner.

In 1972, petitioner borrowed $2,500 from Ms. R., whom he had been dating while separated from his wife. Again, petitioner promised to repay the money within an unrealistically short time period. Ms. R. admitted at the hearing that she knew at the time that petitioner was on probation for embezzlement, but she nevertheless stated that she was under the impression that petitioner was still an attorney because he told her he needed the money to go into practice with Jed Kelson, a practicing attorney. (Petitioner went to work for Kelson as a law clerk.) Petitioner repaid this woman in 1977 after she filed suit against him.

Ms. R. arranged, at petitioner's request, for an additional $1,000 to be borrowed at the same time from her friend Evangeline Sachs. Mrs. Sachs and her husband made numerous attempts to obtain the money, but it has still not been repaid. In 1973, however, petitioner gave Mrs. Sachs a check as repayment, but the check was returned twice due to insufficient funds. Petitioner testified that he knew the check would not clear at the time he wrote it. He also testified that he still intends to repay Mrs. Sachs but has not been able to do so yet.

In 1972, petitioner wrote more than 20 checks which were returned for insufficient funds. Most of the checks were for small amounts of money. Petitioner testified that he knew when he wrote the checks that there was little chance that he could cover them. Criminal charges were filed but were subsequently dismissed when petitioner reimbursed his

---

wife. Both of them are printed forms which at some point include standard references to the note being secured by a deed of trust or mortgage. One note indicates it was signed in Florida and the other indicates it was signed in Los Angeles.

victims. Petitioner did not attempt to offer an excuse for his behavior, but he did note that most of the checks were for groceries and other such items.

Petitioner gave Martin Cadillac a check for automobile repairs in December 1973, which was returned with the notation that the account was closed. Petitioner testified that there was a dispute over the money owed and that he told the cashier he had no intention of paying the bill; she told him he would have to take it up with the manager who was not there. Petitioner stated that he explained on the spot that the check was no good, but that the cashier took it anyway and released his car to him. Petitioner also stated that although there were insufficient funds in the account when he wrote the check, the account was not yet closed. He speculated that the agency must have waited a couple of months before negotiating the check. An examination of the check, however, indicates that the agency deposited the check the same month that it was received.

In 1973, petitioner represented his wife in an eviction action and was thus guilty of unauthorized practice of the law. He signed pleadings, made court appearances and entered into a settlement agreement as "attorney" for his wife. About the same time petitioner also helped a former neighbor prepare an answer in her eviction proceeding and phoned opposing counsel to obtain an extension of time for her to file her answer. Petitioner also represented both himself and his wife in a suit against a Cadillac dealership in early 1974; his representation of his wife again constituted unauthorized practice of law.

Since his disbarment petitioner has worked as a legal researcher and law clerk primarily for two attorneys, Jed Kelson and Joseph Vodnoy. Mr. Kelson was suspended from the practice of law for six months in 1976 for soliciting a personal injury case in 1972 "personally as well as through Tardiff." (*Kelson v. State Bar* (1976) 17 Cal.3d 1, 5 [130 Cal.Rptr. 29, 549 P.2d 861].) At the present hearing, Mr. Kelson testified and denied that petitioner had solicited cases. Criminal charges were filed against petitioner based on this incident, and petitioner was found not guilty. The case was decided on the merits, but the prosecution was unable to locate the codefendant, Doris Wilson, who had been expected to testify. Petitioner worked for Kelson from late 1972 or early 1973 to May 1974.

In May 1974, petitioner began working for Joseph Vodnoy. This was shortly after Mr. Vodnoy committed certain acts which resulted in his criminal conviction for conspiring to solicit business. Petitioner was still working for Mr. Vodnoy at the time of the hearing, despite his knowledge that certain of the firm's personal injury cases were illegally solicited, his knowledge that Mr. Vodnoy had no great objection to obtaining cases in that manner and petitioner's strong suspicion that some of the firm's cases at one time had involved fraudulent accidents.

■ Petitioner recognizes that he bears the burden of proving his rehabilitation and that this burden is a heavy one. (*Feinstein* v. *State Bar* (1952) 39 Cal.2d 541, 546 [248 P.2d 3].) As we have repeatedly said: "'The person seeking reinstatement, after disbarment, should be required to present stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question. In other words, in an application for reinstatement, although treated by the court as a proceeding for admission, the proof presented must be sufficient to overcome the court's former adverse judgment of applicant's character.' [Citations.] In determining whether that burden has been met, the evidence of present character must be considered in the light of the moral shortcomings which resulted in the imposition of discipline." (*Roth* v. *State Bar* (1953) 40 Cal.2d 307, 313 [253 P.2d 969].)

■ Petitioner asserts that he has met this burden and urges us to consider the fact that the disbarment proceeding is the only disciplinary action ever taken against him, that all his victims have been repaid, and that there has been no hint of a problem, personal or business, involving him from 1974 to the present time. Petitioner acknowledges the misconduct he committed before then and does not attempt to excuse it. He reminds us, however, that since 1974, he has worked, paid his bills and attempted to put his life in order. Petitioner emphasizes the testimony of his wife, Attorney Morganstern and Dr. Markman in asserting that he has shown convincing evidence of his present rehabilitation. ■ Testimony of members of the bar and public of high repute who have closely observed petitioner is entitled to great consideration. (*Preston* v. *State Bar* (1946) 28 Cal.2d 643, 651 [171 P.2d 435].)

■ Petitioner relies on *Resner* v. *State Bar* (1967) 67 Cal.2d 799 [63 Cal.Rptr. 740, 433 P.2d 748], and maintains that the facts of his case are closely analogous to it. *Resner* involved the reinstatement peti-

tion of an attorney who had been disbarred for mishandling clients' funds. A number of matters which occurred during the period of his disbarment (1960-1965) were relied upon in opposition to his reinstatement. These matters included an alleged solicitation of a client, claimed evasive answers at the local hearing, asserted mishandling of funds of others in speculative ventures, the signing of verified general denials to obtain more time, a check of $18.50 which was returned for insufficient funds, the guarantee of certain notes when he was without funds, and his substantial indebtedness. The local committee thought that Resner should be reinstated, but the Board of Governors disagreed. We concluded that Resner should be reinstated, that the claims in opposition thereto were either not true or not entitled to great weight, and that Resner's indebtedness should not be held against him. We stated there that "the law looks with favor upon the regeneration of erring attorneys and should not place unnecessary burdens upon them." (*Resner* v. *State Bar, supra,* 67 Cal.2d at p. 811.) "There can, of course, be no absolute guarantee that petitioner will never engage in misconduct again. But if such a guarantee were required for reinstatement none could qualify. All that we can require is a showing of rehabilitation and of present moral fitness." (*Ibid.*)

The State Bar, on the other hand, asserts that petitioner has failed to meet his burden of showing rehabilitation. ■ It notes that although the favorable testimony of witnesses is entitled to great weight, such evidence is not alone conclusive. (*Feinstein* v. *State Bar, supra,* 39 Cal.2d at p. 547.) ■ The State Bar would have us discount much of the testimony regarding petitioner's present trustworthiness on the ground that none of the witnesses had observed petitioner in a fiduciary relationship. This is true, but it is difficult to see how such an observation could have been made when all of the witnesses were testifying about petitioner's behavior while he was not authorized to practice law and thus unable to act in a fiduciary capacity. Nor does it appear that petitioner's psychiatric treatment should be considered a failure because he continued his misdeeds while undergoing such treatment. The important factor is the progress that was made and observed as a result of the treatment, not the behavior displayed while undergoing it.

■ The findings and decision of the hearing panel are entitled to great weight, but the final determination rests with this court. (*In re Gaffney* (1946) 28 Cal.2d 761 [171 P.2d 873].) ■ We are not persuaded that petitioner has met his burden of presenting proof of present

honesty and integrity which is strong enough to overcome our former adverse judgment of his character. (*Roth* v. *State Bar, supra*, 40 Cal.2d at p. 313.) This is not a case in which the applicant has demonstrated slow and steady progress toward rehabilitation since his disbarment. On the contrary, petitioner continued his misdeeds long after his disbarment. That he finally stopped committing such misconduct does not demonstrate sufficient rehabilitation so as to warrant reinstatement to the practice of law.

The petition for reinstatement is denied.

NEWMAN, J.—I dissent. In the majority opinion the paragraph that has most influenced me reads, in part: "Petitioner asserts that he has met this burden [to present stronger proof of his present honesty and integrity than one seeking admission for the first time] and urges us to consider the fact that the disbarment proceeding is the only disciplinary action ever taken against him, that all his victims have been repaid, and that there has been no hint of a problem, personal or business, involving him from 1974 to the present. Petitioner acknowledges the misconduct he committed before then and does not attempt to excuse it. He reminds us, however, that since 1974, he has worked, paid his bills and attempted to put his life in order."

The State Bar does not deny that, since 1974, "there has been no hint of a problem, personal or business...." And my colleagues in their penultimate paragraph correctly assess basic weaknesses of the State Bar's contentions (*ante*, p. 404). Then, surprisingly, the majority nonetheless reject the favorable September 1979 recommendation of the State Bar Court, including the stipulation that the bar's examiner found acceptable.

The purported reasons for that rejection, stated in the majority's final paragraph, are (1) that "petitioner continued his misdeeds long after his disbarment" [i.e., from 1971 to 1974], and (2) "[t]hat he finally [in 1974] stopped committing such misconduct does not demonstrate sufficient rehabilitation so as to warrant reinstatement to the practice of law."

I regret the decision to define rehabilitation so restrictively. *Feinstein* v. *State Bar* (1952) 39 Cal.2d 541 [248 P.2d 3] does not, I believe, re-

quire that from the moment of disbarment the petitioner become a paragon of rectitude. Six years of reasonable rectitude should be adequate, I submit.

Bird, C. J., concurred.

Petitioner's application for a rehearing was denied July 30, 1980.