Arthur E. PATTERSON, Petitioner,

v.

The PEOPLE of the State of Colorado, Petitioner.

No. 07PDJ037.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

March 24, 2008.

---

On January 23, 2008, a Hearing Board composed of MICKEY W. SMITH and FREDERICK Y. YU, both members of the Bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("PDJ"), held a Reinstatement Hearing pursuant to C.R.C.P. 251.18 and 251.29(d). Alexander R. Rothrock and Jennifer M. Osgood appeared on behalf of Arthur E. Patterson ("Petitioner"), and April M. Seekamp appeared on behalf of the Office of Attorney Regulation Counsel ("the People"). The Hearing Board now issues the following "Opinion and Order Re: Reinstatement Pursuant to C.R.C.P. 251.29(b)."

## OPINION AND ORDER RE: REINSTATEMENT PURSUANT TO C.R.C.P. 251.29(b)

### I. *ISSUE*

██ An attorney seeking reinstatement must prove rehabilitation, compliance with disciplinary orders, and fitness to practice by clear and convincing evidence. Petitioner mishandled five client matters while suffering from severe depression. Testimony from Petitioner, his mental health expert, and an attorney peer all demonstrate that he is now in good mental health, compliant with disciplinary orders, and otherwise fit to practice law. The People concur that Petitioner should be reinstated. Should the Hearing Board reinstate Petitioner?

After considering the evidence presented by Petitioner, and the position of the People in this matter, the Hearing Board finds clear and convincing evidence of rehabilitation, compliance with disciplinary orders, and fitness to practice law and concludes that Petitioner should be reinstated to the practice of law.

***DECISION OF HEARING BOARD: ATTORNEY REINSTATED***

### II. *PROCEDURAL HISTORY*

On May 9, 2002, the PDJ approved a Conditional Admission of Misconduct and suspended Petitioner from the practice of law for a period of one year and one day, effec-

tive June 9, 2002.[1] Petitioner filed "Petitioner's Verified Petition for Reinstatement" on June 8, 2007, nearly five years after the effective date of his suspension.[2] On June 26, 2007, the People filed an "Answer to Verified Petition for Reinstatement" and therein agreed to Petitioner's eligibility for reinstatement pursuant to C.R.C.P. 251.29. However, they took no position with regard to his reinstatement pending an investigation to determine whether he "possesses all of the qualifications required of an applicant for admission to the Bar of Colorado."

On January 11, 2008, the parties filed a "Stipulation of Facts" in which they agreed that Petitioner had substantially complied with the provisions of C.R.C.P. 251.28, and had paid all costs and restitution as ordered by the PDJ in his "Order Approving Conditional Admission and Imposing Sanctions." On January 23, 2008, the date of the Reinstatement Hearing, the People stipulated that Petitioner had fulfilled all of the technical requirements for reinstatement under C.R.C.P. 251.29. However, before taking a position on Petitioner's reinstatement, the People chose to first hear his evidence with regard to rehabilitation.

Petitioner testified on his own behalf and presented the testimony of Charles Kline, an attorney from Longmont, and Suzanne M. Pinto, Ph.D., a forensic psychologist, in support of his petition. The PDJ admitted Petitioner's Exhibits 1–3 based upon the stipulation of the parties. The People did not present any witnesses and at the close of the case agreed, subject to the Hearing Board's approval, that Petitioner should be reinstated without conditions.

## III.  FINDINGS OF FACT

▮  The Hearing Board finds the following facts by clear and convincing evidence.

Petitioner has taken and subscribed the Oath of Admission, was admitted to the Bar of the State of Colorado on September 29, 1978, and is registered as an attorney upon the official records of the Colorado Supreme Court, Attorney Registration No. 09126. Pe-

titioner is therefore subject to the jurisdiction of the Colorado Supreme Court and the Office of the Presiding Disciplinary Judge in these proceedings.

### Prior Discipline

On or about April 24, 2002, Petitioner submitted a "Stipulation Agreement and Affidavit Containing the Petitioner's Conditional Admission of Misconduct." The factual basis of the stipulation reveals that Petitioner failed to communicate with clients, neglected client matters, failed to abide by the rules of a tribunal, and failed to promptly return client files and refund any advanced fees not earned in the five client matters described below.

### Rosendal Matter

In January 2001, a wife hired Petitioner to represent her in a dissolution matter. The client paid Petitioner $124.00 for the filing fee. Petitioner prepared a dissolution petition and served the husband, but thereafter failed to file it with the court. When the husband's lawyer tried to file a response to the petition, he was unable to do so because the petition had not been filed. The client thereafter tried to communicate with Petitioner to no avail. On May 11, 2001, the client and her husband filed their own petition for dissolution and terminated Petitioner's representation. Because Petitioner had not filed the petition, he was required to return the filing fee in the amount of $99.00. The remaining $25.00 had been used for service of process.

### Ballard Matter

In March 2000, a husband hired Petitioner to represent him in a modification of parenting time in a post-dissolution matter. The client paid Petitioner $750.00 to draft an agreement following mediation. In November 2000, Petitioner had a heart attack. In January 2001, Petitioner drafted the agreement and sent it to his client who sent it back to Petitioner with revisions. Petitioner thereafter did nothing further. The client

---

1.  *See* "Petitioner's Verified Petition for Reinstatement," Exhibit A.

2.  *See* "Petitioner's Verified Petition for Reinstatement."

attempted to contact Petitioner, but he failed to communicate with the client over a period of months. When the client finally contacted the Petitioner and asked him to return the file, Petitioner failed to do so in a timely fashion.

### Keller Matter

Petitioner represented the wife in a dissolution matter. In March 2000, a permanent orders hearing was held, and thereafter, opposing counsel prepared and submitted a proposed order signed by opposing counsel and her client. Petitioner failed to approve the order, send it to his client, or provide his input to opposing counsel. Opposing counsel submitted the permanent orders with the court and the court approved them. Petitioner's neglect caused opposing counsel to incur additional fees to mitigate the effect of his neglect. Opposing counsel requested that Petitioner pay those fees in the amount of $96.85, which he had not paid at the time of the stipulation.

### Warembourg Matter

In 2001, Petitioner represented the wife in a dissolution matter. A decree of dissolution was entered, but the parties were ordered to attend mediation for unresolved issues. The parties settled all property matters, so the husband's attorney prepared the settlement agreement and submitted the signed settlement to Petitioner. Thereafter, Petitioner failed to take any action on the proposed agreement. When the client later contacted Petitioner, he failed to comply with the client's requests for information regarding the status of the matter. Opposing counsel then filed a motion to enforce the settlement and for sanctions. The court entered an order enforcing the written property settlement and ordering Petitioner to pay the husband $500.00 for attorney fees within ten days of August 6, 2001. Petitioner knew of the order but failed to pay within the ten-day requirement. Petitioner ultimately paid the $500.00 in full with interest in January 2002, but only after the client filed the request for investigation.

### Schweizer Matter

In July 2000, Petitioner represented the wife in post dissolution matters concerning two issues: (1) seeking reimbursement from the husband for half of the house payment that the wife had made for a period of six months, and (2) addressing whether the wife was entitled to maintenance under court orders following the sale of the home. Petitioner eventually provided his client with motions and requests to set hearings, but failed to file the pleadings with the court. The parties reached a stipulation regarding the marital home, but the husband failed to comply with it. Petitioner took no action regarding the husband's non-compliance. The client finally filed her own *pro se* motion for a hearing regarding the husband's failure to comply with the stipulation concerning the marital home. A hearing was held. Petitioner was aware of the hearing, but he did not appear. At the hearing, the husband was ordered to comply with the stipulation, but he failed to do so. The court directed the wife to file a contempt citation and authorized her to proceed *pro se*. Nevertheless, the client attempted to obtain new counsel. At the time of the stipulation, she had not yet filed a motion for contempt. In March 2002, Petitioner filed a motion to withdraw from the case.

### Petitioner's Testimony

Petitioner grew up in Akron, Ohio and received his Bachelor of Arts degree from the University of Colorado in 1974. He received his law degree from Capital University Law School in Columbus, Ohio in 1978. Petitioner passed the Colorado Bar Examination in 1978 and went to work as an attorney in the oil and gas industry until 1983. He and his first wife moved to New Jersey in 1983, where they lived until returning to Colorado in 1987. Upon their return, Petitioner entered into a partnership with James Keen, which lasted until 1995. Petitioner specialized in dependency and neglect matters and held a contract for these cases with Boulder County until 1999.

Petitioner married his first wife during his second year of law school. One morning, after Petitioner left for work, a man broke

into their home and raped his first wife. Petitioner and his first wife suffered significant emotional distress as a result of this traumatic event. Petitioner's first wife sought mental health counseling for posttraumatic stress syndrome and depression. Petitioner decided against seeking similar treatment, as he believed he could handle any issues on his own.

Petitioner testified that despite his wife's depression, she attempted to make a good life with him. However, she ultimately moved to New Jersey and shortly thereafter asked him for a divorce. Petitioner testified that her request devastated him, because no one in his family had ever been divorced. Nevertheless, they amicably divorced in 1992. They decided that she would raise their baby daughter in New Jersey, and that he would raise their son in Colorado.

Petitioner became a "workaholic" as a way to deal with his emotional problems. He engaged in a high-volume solo practice specializing in dependency and neglect, domestic, and criminal law matters. Petitioner maintained approximately 100 cases a year and provided *pro bono* services for many of his clients. He seldom worked with a support staff, as he typically preferred to perform the work himself, rather than delegate to others.

Petitioner testified that he consumed himself with his practice and rarely socialized with others. Although he coached his son's football and baseball teams, Petitioner recognizes that he was not "emotionally available" for his son at that time. He enjoyed the practice of law and he thought that he did not have to be a good friend or father because he was a good lawyer.

When his father died of a heart attack, Petitioner attended the services and then returned to work immediately following the funeral. Again, the way he handled the emotional issues attendant with his father's death was to absorb himself in his work.

In November 2000, Petitioner suffered a heart attack shortly after arriving in Newark, New Jersey. His daughter had been elected homecoming queen and had asked Petitioner to attend the ceremonies. When he returned to Colorado, Petitioner noticed, "something was happening." Work he normally performed in fifteen minutes now took him over an hour. Petitioner also noticed that he no longer enjoyed courtroom work. He became more aggressive and even received an off-the-record rebuke from a judge for his behavior. In the spring of 2001, Petitioner decided to quit the practice of law and wind down his practice, because as he described it, "I did not have the butterflies when I went into court."

During this time, Petitioner admittedly neglected client matters. He felt as though he scrambled to complete tasks with diminished energy for the practice. Petitioner hired an assistant, but now realizes that he expected her to complete his work. He expressed remorse for his misconduct in the five client matters discussed above. Petitioner did not fight the disciplinary action taken against him, and he entered into a stipulation where he took full responsibility for his misconduct. Petitioner has since made restitution to those clients and now recognizes that he should have handled their cases responsibly.

During the course the disciplinary process, which ultimately led to his suspension, Petitioner began communicating with a woman he first met in college. She has two children from a previous marriage and a successful medical transcription business in Florida. In December 2001, they married and Petitioner moved to Florida. Thereafter, Petitioner passed his mortgage broker's exam and has been successfully working as a mortgage broker in Florida. With business slow due to the declining real estate market, he has assisted his sons in starting up a small business in Florida. Since moving to Florida, he has maintained a "balanced and proportional" life. He lives simply and frugally and he no longer feels the need to bury himself in his work.

Approximately six years ago, Petitioner's sister died tragically in Longmont. Petitioner testified that losing his sister was difficult, but that he has learned to grieve by honoring her memory. Contrary to the way he dealt with emotional trauma in the past, he now seeks out family and friends instead of pushing them away. He maintains a close rela-

tionship with his wife and stepchildren, his mother, and his deceased sister's husband who still resides in Longmont.

In May 2006, Petition began working for Charles Kline, a lawyer with whom he previously worked and tried cases against when he practiced law in Colorado. Mr. Kline has asked Petitioner to provide him with legal research, case analysis, trial preparation, and drafts of pleadings. Petitioner provides this work remotely; that is, Petitioner researches issues on his computer in Florida and provides his work product to Mr. Kline for review. Petitioner is in daily contact with Mr. Kline. He has drafted two appellate briefs for matters before the Colorado Court of Appeals, as well as legal research concerning domestic, probate, criminal, and civil law. In addition, Petitioner's mortgage broker business affords him the opportunity to encounter principles of real estate, title, and contract law on a regular basis. In addition, Petitioner completed a number of CLE courses in advance of filing his petition for reinstatement.[3]

Respondent testified that he is not planning to return to Colorado to practice law. He will likely continue to work with Mr. Kline by providing pleadings, case analysis, and briefs to him. Petitioner does not want to practice law as he practiced in the past in Colorado or Florida. His primary motivation in seeking reinstatement is to close the gap in his life that his suspension from the practice of law brought him. If the mortgage business picks up again, Petitioner may primarily work in that endeavor to the exclusion of the law. He nevertheless believes that he is fully rehabilitated from the depression that led to his suspension. If Petitioner ever returns to the practice of law, he would limit himself to ten to fifteen cases a year. Although he does not want to return to a volume practice, he admits to missing the courtroom.

While Petitioner has not engaged in any formal community service, he began to train his dog as a "therapy dog," but later had to abandon that effort when his dog developed cataracts. In addition, he provided assistance to neighbors during the hurricane season in Florida. Petitioner engaged in these activities because he believed they were the right things to do as a citizen. He testified that he would not, however, take on the number of *pro bono* cases he handled in the past. He now understands the importance of balance in his life.

### Testimony of Suzanne M. Pinto, Ph.D.

Suzanne M. Pinto, Ph.D., has examined and provided forensic evaluations in more than 500 cases involving domestic, criminal, competency, insanity, and sex offense matters. Dr. Pinto previously knew Petitioner professionally from her work with the Boulder courts, where she observed his excellent reputation in the Boulder legal community. In November 2007, Dr. Pinto examined Petitioner and issued a report on her findings.[4] In preparing her report she took a full history form Petitioner, conducted cognitive and personality testing, and conducted a clinical interview.

Dr. Pinto testified that Petitioner suffered from severe depression at or about the time of his suspension as a direct result of a combination of events. Petitioner initially suffered from the rape of his first wife and later suffered from the death of his father. He managed to maintain a degree of stability by immersing himself in his work. However, following his heart attack, Petitioner's depression started to affect his work. Dr. Pinto confirmed that depression often follows a heart attack. In Petitioner's case, he began to realize his own mortality and the law could no longer keep him vigilant about his professional responsibilities.

Shortly after his heart attack, Petitioner reported a lack of energy, easy distraction, and loss of interest in his work. Dr. Pinto's opinion is that Petitioner's depression is not chronic, but episodic and related to a confluence of events ending in his heart attack.

Based upon Dr. Pinto's psychological interview and testing, she finds that Petitioner is of above average intelligence and that he has experienced a substantial change in thinking

---

3. *See* "Stipulation of Facts."

4. *See* Petitioner's Exhibit 2.

in an effort to correct his past negligence in dealing with clients. He has insight into his depression and now has a substantial support group. Most important, he no longer buries himself in work to avoid emotional conflict. Dr. Pinto opined that it is possible, but not likely, that Petitioner may suffer a relapse. She therefore recommends his reinstatement to the practice of law.

### Testimony of Charles Kline

Charles Kline is a lawyer who practices in the Boulder area. Mr. Kline met Petitioner in 1987 when Petitioner was appointed as a GAL in one of his dissolution cases. Over the years, Mr. Kline came to respect Petitioner's work as a trial lawyer. He testified that Petitioner had a good courtroom demeanor and presence. On cases he worked with Petitioner, Mr. Kline found that he and Petitioner often evaluated them the same way. Before his heart attack, Petitioner had energy and interest in his cases. After his heart attack, Petitioner quickly tired and seemed lethargic. Mr. Kline often asked Petitioner if he felt all right and Petitioner always assured Mr. Kline that everything was fine. In 2001, Petitioner met his second wife and started to talk to Mr. Kline about retiring from his law practice. Shortly thereafter he moved to Florida. Nevertheless, Mr. Kline kept in contact with Petitioner.

In 2006, Petitioner, under Mr. Kline's supervision, began assisting Mr. Kline on legal matters, including appellate briefs, legal memoranda, and other pleadings. Mr. Kline testified that this arrangement has worked so well that he no longer feels the need to hire an associate. Petitioner's work is "just great." Mr. Kline sometimes asks for assistance on his way to court and receives an answer before he arrives. Mr. Kline would like to see Petitioner move back to Colorado and if he did, Kline would welcome him at his law firm.

Mr. Kline testified that Petitioner is a changed man. In his words, Petitioner is a "completely different person" from the man he knew immediately following the heart attack. Mr. Kline believes that Petitioner now enjoys his life and that he maintains a healthy and positive outlook. Mr. Kline therefore recommends that Petitioner be reinstated to the practice of law.

## IV. LEGAL ANALYSIS

When an attorney has been suspended for longer than one year, the reinstatement process begins with the submission of a verified petition for reinstatement under C.R.C.P. 251.29(c). C.R.C.P. 251.29(c) states, "[a]n attorney who has been suspended for a period longer than one year must file a petition with the Presiding Disciplinary Judge for an order of reinstatement and must prove by clear and convincing evidence that the attorney has been rehabilitated, has complied with all applicable disciplinary orders and with all provisions of this chapter, and is fit to practice law." The petition must set forth, in part:

(3) The facts other than passage of time and absence of additional misconduct upon which the petitioning attorney relies to establish that the attorney possesses all of the qualifications required of applicants for admission to the Bar of Colorado, fully considering the previous disciplinary action taken against the attorney;

(4) Evidence of compliance with all applicable disciplinary orders and with all provisions of this Chapter regarding actions required of suspended lawyers;

(5) Evidence of efforts to maintain professional competence through continuing legal education or otherwise during the period of suspension.

C.R.C.P. 251.29(c). A hearing board makes the reinstatement decision. C.R.C.P. 251.29(e). An attorney *may* be reinstated to the practice of law upon demonstration, by clear and convincing evidence, that the attorney (1) has been rehabilitated, (2) has complied with all applicable disciplinary orders and all rules regarding reinstatement, and (3) is fit to practice law. C.R.C.P. 251.29(b) and (d). All three elements must be shown before the hearing board may authorize reinstatement. The hearing board may also consider the attorney's past disciplinary record. C.R.C.P. 251.29(e). If an attorney is unable to satisfy the burden of proof and the peti-

tion for reinstatement is denied, the attorney may not reapply for a period of two years. C.R.C.P. 251.29(g).

The concept of rehabilitation has been described in many different ways. It has been characterized as "the reestablishment of the reputation of a person by his or her restoration to a useful and constructive place in society." *In re Cason,* 249 Ga. 806, 294 S.E.2d 520, 522 (1982). It has also been defined as "regeneration," denoting an overwhelming change in the applicant's state of mind. *In re Cantrell,* 785 P.2d 312, 314 (Okla.1989). The analysis of rehabilitation should be directed at the professional or moral shortcoming(s) out of which the discipline arose. *Tardiff v. State Bar,* 27 Cal.3d 395, 165 Cal.Rptr. 829, 612 P.2d 919, 923 (1980). It is not enough to show that the attorney is doing what is proper; rather, there is a requirement of positive action. *See In re Sharpe,* 499 P.2d 406, 409 (Okla. 1972). In *People v. Klein,* 756 P.2d 1013, 1016 (Colo.1988), the Colorado Supreme Court declared that the rehabilitation assessment "must include the consideration of numerous factors bearing on the [attorney's] state of mind and ability." [5] These factors include but are not limited to:

- Character;
- Conduct since the imposition of discipline;
- Professional competence;
- Candor and sincerity;
- Recommendations of other witnesses;
- Present business pursuits;
- Personal and community service; and
- Recognition of the seriousness of previous misconduct.

The Hearing Board finds that Petitioner experienced a substantial change in his state of mind and his ability to complete legal tasks since the time of his suspension. Petitioner has fully addressed the issues that led to his severe depression and his subsequent discipline for neglect of client matters. He appeared candid, sincere and remorseful in these proceedings and he appreciated the seriousness of his past ethical lapses. The Hearing Board also finds that Petitioner maintained his professional competence during his suspension and complied with all applicable orders since that time. Therefore, the Hearing Board finds clear and convincing evidence that Petitioner is now rehabilitated, is in compliance with all the applicable rules in the reinstatement, is otherwise fit to practice law, and should be reinstated to the practice of law. We therefore accept and agree with the People's recommendation that Petitioner be reinstated without conditions.

## V.  *ORDER*

It is therefore ORDERED:

1. The Hearing Board **GRANTS** "Petitioner's Verified Petition for Reinstatement." Petitioner, **ARTHUR E. PATTERSON,** Attorney Registration No. 09126, **SHALL** be reinstated to the practice of law effective immediately.

2. Petitioner **SHALL** pay the costs of these proceedings; the People shall submit a Statement of Costs within fifteen (15) days of the date of this order, and Petitioner may submit a response within ten (10) days thereafter.

---

5.  While this case interpreted the previous rule, C.R.C.P. 241.22, it looks to the ABA factors for determining rehabilitation and provides valuable guidance in this area.