**Andrea CHRISTMAN, Petitioner,**

**v.**

**The PEOPLE of the State of Colorado, Respondent.**

**No. 15PDJ063.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Feb. 10, 2016.

---

## OPINION AND DECISION DENYING REINSTATEMENT UNDER C.R.C.P. 251.29(e)

### I. *PROCEDURAL HISTORY*

Petitioner took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 28, 2010, under attorney registration number 42796.[1] She is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this reinstatement proceeding.[2]

By order of the Colorado Supreme Court, Petitioner was immediately suspended from the practice of law on November 6, 2013. On April 17, 2014, Presiding Disciplinary Judge William R. Lucero ("the PDJ") approved a conditional admission of misconduct and suspended Petitioner's license for a period of one year and one day.[3] The suspension took effect that same day.

On July 24, 2015, Petitioner filed a petition for reinstatement. James S. Sudler III and Alan C. Obye, Office of Attorney Regulation Counsel ("the People"), answered on August 12, 2015. The PDJ held a scheduling conference on September 8, 2015, and Petitioner agreed to set this matter for a hearing to be

---

1. Stip. Facts ¶ 1.

2. *See* C.R.C.P. 251.1(b).

3. Stip. Facts ¶ 3.

held on December 19, 2015. On December 10, 2015, the People filed a motion requesting that the PDJ accept, out of time, the parties' stipulated facts and stipulated exhibits. The People explained that the parties had met on the morning of December 7 to stipulate to certain facts and exhibits but that Petitioner had failed to sign the proposed filings until the evening of December 9. The PDJ accepted the filings, even though they were not timely submitted.

On December 19, 2015, a Hearing Board comprising Jennifer Ann Poynter, Esq., Melinda M. Harper, CPA/ABV/CFF, CFE, and the PDJ held the reinstatement hearing under C.R.C.P. 251.29(d) and 251.18. Petitioner appeared pro se, and Obye attended on behalf of the People. The Hearing Board considered testimony from Petitioner, and the PDJ admitted stipulated exhibits S1–S3.

## II. *FINDINGS OF FACT*

The findings of fact here—aside from the sections describing Petitioner's disciplinary record and conditional admission of misconduct—are drawn from testimony offered at the reinstatement hearing, where not otherwise noted.

### Petitioner's Misconduct

As set forth in the 2014 conditional admission of misconduct, Petitioner engaged in misconduct in six client matters.

In the first matter, Petitioner represented Tabitha Pratt, who was trying to resolve issues of parental responsibilities with the father of her minor daughter. Petitioner entered her appearance and attended a hearing in which the parties agreed to participate in a mediation. On the day of the mediation, Petitioner appeared but Pratt told her not to stay. Later, Pratt and the child's father filed a stipulated parenting plan with the court. A little more than a week later, Pratt and Petitioner attended a status conference, during which the court identified outstanding child support issues and reopened the case. The court ordered the parties to submit financial information to the Denver Department of Human Services, which in turn filed a motion to modify child support. Having

noted that the motion contained outdated financial information from the child's father, Pratt called Petitioner several times about her concerns. Between September 2012 and May 2013 Pratt sent Petitioner emails about the errors in the motion and to request a refund of the unused portion of her retainer, but Petitioner failed to respond or to take further action on Pratt's behalf. Petitioner did not tell Pratt that she left Colorado. Because Petitioner remained the attorney of record, Pratt was unable to seek reconsideration of the child support award until Petitioner withdrew from the representation.

In the Pratt matter, Petitioner violated Colo. RPC 1.3, which requires lawyers to act with reasonable diligence and promptness; Colo. RPC 1.4(a)(3)–(4), which require lawyers to communicate with clients; Colo. RPC 1.16(c), which requires lawyers to seek a tribunal's permission to withdraw from representation; and Colo. RPC 1.16(d), which requires lawyers to protect their clients' interests upon termination of the representation.

In a second client matter, Petitioner represented Brett Gaudreault in a post-decree matter captioned *In re the Marriage of Gaudreault*, case number 09DR1116, in Douglas County District Court. In August 2012, Petitioner appeared at a contempt hearing where Gaudreault was found in contempt for failure to pay child support. In February 2013, Gaudreault's ex-wife filed another motion for contempt, alleging that Gaudreault had not complied with court orders. Petitioner failed to appear with Gaudreault at a contempt advisement hearing on July 12, 2013. At that advisement hearing, Gaudreault stated that he had unsuccessfully attempted to contact Petitioner. The district court then called Petitioner's Colorado telephone number and left a voicemail message, but Petitioner never responded. Opposing counsel later moved for permission to communicate with Gaudreault directly, and the court granted the motion. In this matter, Petitioner violated Colo. RPC 1.3, 1.4(a)(3)–(4), 1.16(c), and 8.4(d), which provides that lawyers commit misconduct by engaging in conduct that is prejudicial to the administration of justice.

In a third client matter, Petitioner entered into a fee agreement in 2011 with Kevin Roche to assist him with a real property partition dispute, though Petitioner had no prior experience in such matters. She timely filed an answer, but the answer contained no affirmative defenses or counterclaims. She did not obtain or request any documents other than the complaint for partition, and she did not disclose any documents. She also failed to respond to a motion for an order and decree for partition of the property. Because Petitioner did not respond, the court issued a decree and order for partition, ordered that the property be sold, and directed that Roche's proceeds from the sale should first be applied to an IRS lien. Petitioner did not notify Roche of the decree and order for partition, although she claimed that Roche was timely notified by his attorney for another matter. In this case, Petitioner breached Colo. RPC 1.1, which requires lawyers to provide competent representation. She also violated Colo. RPC 1.3 and 1.4(a)(3).

In a fourth client matter, Petitioner represented Carlos Sermeno in post-decree child support matters. In December 2012, Sermeno's ex-wife filed a motion for a contempt citation against Sermeno. The court held two hearings on the motion, neither of which Petitioner attended, instead asking another attorney to appear on her behalf. In May 2013, the court held an evidentiary hearing, but Petitioner did not inform Sermeno that another attorney would appear in her stead. She did not prepare Sermeno for the hearing and counseled him to accept a deal she had negotiated with opposing counsel. Because he did not feel well represented, Sermeno reluctantly agreed to the stipulation. Also around that time, the court ordered the parties to set a hearing on a motion to modify parenting time, which had been filed in early 2013. Petitioner set the hearing for November 25, 2013, but did not timely notify Sermeno of the hearing. Sermeno attempted to contact Petitioner many times between May and November 2013 but was unable to reach her. On November 22, 2013, Petitioner filed a notice of withdrawal, stating that she had been immediately suspended. On November 24, 2013, the day before the hearing, Petitioner informed Sermeno of the hearing and

alerted him that she would not be appearing. Sermeno attended the hearing, only to be told that it had been reset. Petitioner only notified Sermeno of her immediate suspension by letter dated November 26, 2013. Through this misconduct, Petitioner violated Colo. RPC 1.1, 1.3, 1.4(a)(3), and 1.16(d).

In a fifth client matter, Petitioner agreed to represent Martha Cruz pro bono in a dissolution of marriage case. The parties filed, and the court accepted, a joint separation agreement. As part of that agreement, Cruz was to transfer to her ex-husband her Colorado Public Employees' Retirement Association ("PERA") account. PERA sent Petitioner forms for Cruz to complete in order to effectuate the transfer, but Petitioner never forwarded them to Cruz, and Cruz assumed Petitioner had taken care of the transfer. When Cruz learned that the transfer had never been made she attempted to contact Petitioner several times, but Petitioner did not respond. After months had passed, Cruz filed a request to proceed pro se, since Petitioner had failed to withdraw. Cruz then filed the appropriate PERA forms. Cruz maintained, however, that because Petitioner did not timely complete the transfer just under $7,000.00 in taxes were needlessly incurred. Through this misconduct, Petitioner violated Colo. RPC 1.1, 1.3, 1.4(a)(3), and 1.16(d).

In a sixth client matter, Petitioner, who was attorney of record for the defendant in Jefferson County District Court case *Liberty Mutual Insurance v. Havens*, failed to file pleadings, initial disclosures, and discovery responses, resulting in entry of default judgment against Havens in April 2013. Petitioner maintained that her client wished to default on the matter, yet she did not notify the opposing party of his wishes, nor did she comply with discovery requests or deadlines, with the result that Havens was assessed additional attorney's fees and fines. Petitioner thereby violated Colo. RPC 1.1 and 1.3.

Further, on three occasions, Petitioner allowed a third-party vendor to automatically deduct funds from her trust account in violation of Colo. RPC 1.15(i)(2) (2008), which

prohibits lawyers from permitting automatic deductions from trust accounts without supervision.

As a sanction for her misconduct, Petitioner agreed to a one-year-and-one-day suspension, and to pay costs in the amount of $91.00 within thirty-five days of approval of the conditional admission. The PDJ approved the conditional admission on April 17, 2014, effective that same day. Petitioner timely paid the costs.[4] She also filed an affidavit of compliance with the PDJ's disciplinary order under C.R.C.P. 251.28(d).[5]

### Petitioner's Testimony Regarding Her Qualifications for Reinstatement

Petitioner was born and raised in New Mexico. She has always had a deep and abiding desire to serve her community, she said, and she was drawn to the law as a vehicle for doing so; she was never "in it" for the prestige or money. She came to Colorado to attend law school at the University of Denver Sturm College of Law ("DU Law"). After her first semester of law school, she returned to New Mexico to complete her MBA. She later returned to DU Law. After her second year of law school, her father committed suicide. After her third year of law school, she graduated and passed the Colorado and New Mexico bar examinations.

Petitioner resolved to strike out on her own, and she established a solo practice in 2010, which she considers her "first mistake." In the main, her case load consisted of criminal and family law cases, but she dabbled in many different areas of substantive law in order to pay bills. She now recognizes that she was not "fully competent" to work as a solo practitioner. For instance, she said, she did not know that she was required to file motions to withdraw in domestic relations cases after divorces were finalized; as a result, she remained attorney of record for several post-dissolution matters, regardless of whether she intended to continue those representations. She also acknowledged that she was not competent to handle the Roche real estate matter, which she failed to realize was "out of her league."

In mid-2012, Petitioner decided to close her practice and take an auditing job with Promontory Financial Services, which permitted her some latitude in scheduling so that she could wind-up her ongoing cases. She stopped taking clients, and the only active case on her roster was Sermeno's. Her contract ended with Promontory in January 2013, and she decided it was time to evaluate her situation. She was struggling here in Colorado, she recounted, and she missed her family. On a visit to New Mexico around Easter 2013, she accepted an associate position with the Branch Law Firm in Albuquerque to handle medical malpractice and general civil law cases. She moved back to New Mexico soon thereafter and officially shuttered her Colorado practice in July 2013, though emails were still routed to her Christman Law Firm email account, and calls were received at her office telephone number. She did not notify Pratt, Sermeno, Cruz, or Havens of her move to New Mexico.[6]

At the Branch firm, Petitioner recalled, she began to appreciate the importance of supervision and the need to ask for help and guidance. Branch's systems—including those for calendaring, organization, and communication management—helped illuminate, she said, the "difference between what I was doing wrong and what I do now." But it was during Petitioner's time at Branch that she actively avoided emails and telephone calls from her Colorado clients. She explained that when she received these communications she felt overwhelmed and decided simply to ignore them.

In November 2013, Petitioner was immediately suspended in Colorado after failing to respond to the PDJ's order to show cause. She remembered feeling overwhelmed by the People's inquiries and thus sedulously avoided them, leading to her immediate suspension. The State of New Mexico kept Petitioner's license active pending resolution of the disciplinary charges here. In March 2014, however, Petitioner "saw the writing on

4. Stip. Facts ¶ 4.

5. Ex. S3; Stip. Facts ¶ 5.

6. Ex. S1.

the wall," stipulated to a suspension of her Colorado license for one year and one day, and resigned from Branch. At the reinstatement hearing, Petitioner cast her misconduct as primarily a competence issue in the Roche matter and, in the others, a failure to properly withdraw from cases. While she acknowledged that she had earlier stipulated to failing to respond to repeated client calls and emails, she also stated that "in hindsight" she disagreed with at least one such paragraph to which she stipulated.[7] The Roche matter was the most egregious of her many offenses, she said, because her errors in that case were the most "impactful." Of the Havens matter, she contended that she was merely doing her client's bidding: he wanted default to enter in his case, she said, and he instructed her to take no action.

Petitioner timely self-reported her Colorado suspension to the Disciplinary Board of the New Mexico Supreme Court.[8] She was suspended for one year and one day in New Mexico, effective April 17, 2014, based on reciprocal discipline.[9] She remains suspended in New Mexico.[10]

After resigning from Branch, Petitioner was unemployed until July 2014, when she took a position as field tax auditor with the State of New Mexico's Department of Workforce Solutions. A few months later she applied for a position as an administrative law judge ("ALJ") in the same department. She was hired in October 2014 and has held the position ever since.

Though the ALJ position does not require a law degree, Petitioner related how her job draws on many of the same analytic skills and ethical considerations as the practice of law. Petitioner presides over hearings involving appeals of unemployment benefit decisions. She rules on pretrial and evidentiary matters, and she issues findings of fact and legal conclusions. The position comes with oversight and accountability, and she believes she is good at her job; she testified that she was named employee of the month

in July 2015. Petitioner plans to continue in her role as ALJ for the foreseeable future. "I am happy where I am," she testified, "but that doesn't mean I don't want my license back." She is aware that a law license opens doors and allows for career advancement in the state and federal systems. She also wants to regain her license for "emotional, financial, and personal reasons."

Petitioner testified that since her suspension she has taken several classes in tax and business law at a local community college and was certified to file individual federal tax returns for others. She does not read bar periodicals or legal journals, nor does she belong to a bar association or otherwise have a mentor in the legal profession. She took one continuing legal education ("CLE") course in 2014 and reviewed an ethics video to meet New Mexico requirements. In 2015, she says, she accumulated eleven general CLE credits and seven ethics CLE credits in Colorado, as well as thirteen-and-a-half general and four ethics credits in New Mexico. Petitioner related that she chose CLE courses that would enhance her practice of law, with a focus on ethics and business management issues. She did not offer any evidence to support her testimony.

Since moving back to New Mexico, Petitioner testified, she has taken measures to better herself through education and self-healing. Her family has a history of depression, and she has worked to take care of herself, eliminate stress, and reduce anxiety through running, meditation, yoga, faith-based healing, and helping others. She has returned to her church, where she teaches first- and second-grade catechism once a week. She volunteers with Big Brothers Big Sisters of New Mexico. For more than two years, she has met with her seven-year-old "little sister" for a few hours every other week. In 2014, she was assigned a high-school mentee through a program called Mentor 2.0, which pairs high school students with community members for encouragement and guidance. And in September 2015, she

---

7. Petitioner explicitly disagreed with the facts set forth in paragraph oo of the conditional admission of misconduct. *See* Ex. S1.

8. Stip. Facts ¶ 7.

9. Stip. Facts ¶ 7.

10. Stip. Facts ¶ 7.

began volunteering with Wings for Life, a program that provides assistance for family members of prisoners. Through this group Petitioner has tutored children and raised funds; she recently was voted to the board of directors. Petitioner affirmed that being involved in the community is very important to her, and she plans to continue to volunteer whether or not she is reinstated.

Looking back on the past two years, Petitioner emphasizes that she has come to realize how critical communication, mentoring, and diligence are to the practice of law. Among the many lessons she says that she learned are the following: "You can't suck it up and go it alone—you just can't"; "[problems] are not going to get less unpleasant if you don't face [them]"; and "communication is key." She also declared that she has no intention of reoffending and assured the Hearing Board that she is not likely to repeat her past misconduct, for two reasons. First, she said, she is aware of what happened, and self-knowledge is critical. "The knowledge that I've gained over time, and just knowing how important these little things are will prevent me from doing them in the future," she testified. Second, neither mishandling trust funds nor failing to act diligently will be an issue for her in the future, she explained, because in her current position she is not responsible for others' money, and her diligence as an ALJ is ensured by the limited nature of the issues before her.

Under the PDJ's scheduling order, Petitioner was ordered to submit a hearing brief in advance of the reinstatement hearing.[11] She did not comply with this directive, and she could offer no justification for her failure to do so when questioned. She did not submit an exhibit list and never attempted to present documentary evidence to support her testimony. Nor did she call witnesses or seek to introduce witness statements. She explained that she could not ask other ALJs to clear their dockets and travel to Colorado, particularly around the holidays.

Petitioner conceded, however, that she "didn't explore" other options of presenting witness statements via telephone testimony, affidavits, or letters. In fact, she remarked that she had failed, "as usual," to exercise diligence on this front. She also mentioned that although she prepared for the hearing on her own, she had asked for assistance at some point from New Mexico attorneys; "because of the timing of it," she said, she could not secure representation. About a week before the hearing, Petitioner consulted with a DU Law advisor, who had been recommended by Petitioner's own law school mentee. That advisor counseled her to submit witness affidavits, as well, but by that point Petitioner had missed the deadline to file exhibits and she was reluctant to seek an extension. This, even though she acknowledged how helpful witness statements might be to her case.

### III. *LEGAL ANALYSIS*

 To be reinstated to the Colorado bar, an attorney who has been suspended for longer than one year must prove by clear and convincing evidence that the attorney has complied with applicable disciplinary orders and rules, is fit to practice law, and has been rehabilitated.[12] Failure to prove even one requirement is fatal to a petitioner's reinstatement.[13]

### Compliance with Disciplinary Orders and Rules

An attorney who is petitioning for reinstatement must show compliance with disciplinary orders and the Rules of Professional Conduct. The People do not dispute that Petitioner complied with the technical requirements of C.R.C.P. 251.28 and 251.29. They agree that she has obeyed the PDJ's order of discipline, and that she has paid all costs associated with her disciplinary proceeding.

### Fitness to Practice Law

 Petitioner argues that her position as ALJ, coupled with the many CLEs she says

---

**11.** *See* Scheduling Order at § III(7)(A) (Sept. 8, 2015).

**12.** C.R.C.P. 251.29(b).

**13.** *See In re Price,* 18 P.3d 185, 189 (Colo.2001).

she has recently completed, demonstrate her fitness to practice law. The People disagree. They maintain that her testimony, standing alone, is insufficient to meet her burden of clearly and convincingly proving this element.

We are compelled to adopt the People's position. Petitioner must affirmatively prove her fitness to practice law in a manner that satisfies us that reinstatement of her license will not pose a threat to the public. We cannot make that finding on her testimony alone. Petitioner could have provided evidence of the number and type of CLE courses that she completed. She did not. She could have presented in-person or absentee testimony, affidavits, or letters from colleagues or supervisors (past or present) to show that her job as an ALJ builds on and develops legal skills and training. She did not.

As a result, all we have her is say-so, which is inadequate to assuage our concerns. After all, the misconduct to which she stipulated included incompetence; her failure to establish *how* she has been made competent to represent clients through the CLEs she has taken or through the job she performs leaves us worried that nothing has changed.[14] Likewise, her decision to forgo documentary proof or corroborative testimony speaks volumes, we think, about her current ability to competently represent members of the public. In short, we have little confidence that

Petitioner possesses the legal skills, training, or initiative necessary to practice law at this time.

Our finding on this element renders Petitioner ineligible for reinstatement.[15] But we also address the deficiencies in her presentation concerning rehabilitation, deficiencies that also leave us no choice but to deny her petition for reinstatement.

## Rehabilitation

The Hearing Board cannot grant reinstatement simply upon a showing that Petitioner has engaged in proper conduct or refrained from further misconduct. Instead, we must look to whether she has experienced an overwhelming change in her state of mind such that she could be said to have undergone a regeneration.[16] In this analysis, we are guided by the leading case of *People v. Klein*, which enumerates several criteria for evaluating whether Petitioner has been rehabilitated.[17] These factors are: character; conduct since the imposition of the original discipline; professional competence; candor and sincerity; recommendations of other witnesses; present business pursuits; personal and community service aspects of Petitioner's life; and recognition of the seriousness of her previous misconduct.[18] The *Klein* criteria provide benchmarks to assess the likelihood that Petitioner will repeat her prior misconduct.

---

**14.** Because Petitioner does not need a law license to serve as an ALJ, we question whether occupying that position would per se be sufficient to render her competent to practice law. We need not reach that question here, however, because Petitioner did not adduce any evidence to bolster her claims of competence or otherwise prove clearly and convincingly that we should find her fit to practice.

**15.** *Price*, 18 P.3d at 189 ("Because the lawyer seeking reinstatement must prove that all three factors exist, a failure of proof on any one factor is fatal to the lawyer's reinstatement.").

**16.** *See In re Cantrell*, 785 P.2d 312, 313 (Okla. 1989); *In re Sharpe*, 499 P.2d 406, 409 (Okla. 1972).

**17.** 756 P.2d 1013, 1015–16 (Colo.1988) (interpreting language of C.R.C.P. 241.22, which embodied an earlier version of the rule governing reinstatement to the bar).

**18.** *Id.* at 1016. We note that the *Klein* decision relies upon an earlier version of the *Lawyers' Manual on Professional Conduct* (ABA/BNA) 101:3005, which listed the above factors for assessing the rehabilitation of lawyers seeking reinstatement. The current version of the manual sets forth a number of other factors to consider when evaluating a lawyer's rehabilitation and fitness: the seriousness of the original offense, conduct since being disbarred or suspended, acceptance of responsibility, remorse, how much time has elapsed, restitution for any financial injury, maintenance of requisite legal abilities, and the circumstances of the original misconduct, including the same mitigating factors that were considered the first time around. *Id.* at 101:3013. While some of these newly articulated factors are encompassed in our analysis, we do not explicitly rely on them to establish a framework for our decision.

█ We first consider together Petitioner's character, professional competence, and conduct since the imposition of her suspension—including her presentation to the Hearing Board in this matter. Our analysis of Petitioner's character is directed toward determining whether she has addressed her shortcomings, since the imposition of discipline is necessarily predicated upon a finding of some shortcoming, whether it be a personal deficit, professional deficit, or environmental challenge.[19]

In Petitioner's case, her misconduct seems to have stemmed from a blend of all three. She described experiencing feelings of depression while living in Colorado, isolated from her family and battling the stress of having "jumped off the cliff" by opening a solo practice right out of law school. She has not "been in that place" since moving back to New Mexico, she attested, and we do believe that the change in her environment has made a significant difference in her ability to cope with anxiety.

She has also found a position that does not appear to bring into play the professional and personal deficits—namely, incompetence and lack of diligence and communication—that led to her discipline. The issues she addresses as an ALJ are circumscribed, her tasks routine, and the timing predictable. This is not to say, however, that the deficits that triggered her misconduct have been corrected; they merely have been controlled through selection of suitable employment. While Petitioner assures us that her misconduct is unlikely to reoccur, she relies for support not so much on a change in her *character*, but a change in her *circumstance*—her position as ALJ. That Petitioner looks to her current situation as a preventative against future misconduct gives us scant comfort that, removed from her role as ALJ, she could conform her conduct to the Rules of Professional Conduct.

Our judgment here is underscored by the way Petitioner approached this matter. Though she purports to have learned lessons from her disciplinary travails, that claim is belied by her actions in this case. She testified that she learned the importance of communication, yet she did not discuss with opposing counsel the possibility of presenting affidavits or absentee testimony at the hearing. She testified that she learned the importance of seeking guidance, yet she chose to represent herself and consulted only with a DU Law advisor just one week before the hearing. Moreover, she declined to solicit character witnesses to testify on her behalf at the hearing; indeed, we doubt whether any of her colleagues even know about this proceeding. Finally, she testified that she learned the importance of acting with diligence, but she failed to sign the parties' proposed stipulations of facts and exhibits until the deadline for those submissions had passed. She did not gather evidence to corroborate her testimony about the CLEs she had taken, nor did she file a prehearing brief in this matter. Such conduct suggests that a change in Petitioner's character has not occurred; the deficiencies that contributed to her misconduct still appear to exist.

We are also troubled by Petitioner's ruminations about her misconduct, which reflect negatively on her candor and her ability to recognize the seriousness of her misconduct. During cross-examination, she backed away from accepting responsibility for each act to which she had stipulated. Specifically, she disclaimed her stipulation that she failed to communicate with Sermeno, and she defended her decision not to act in the Havens matter on the grounds that her client had instructed her to default. This unwillingness to admit to and accept responsibility for all factual bases of her stipulation raises doubts about the extent to which she has held herself accountable for her misconduct and internalized the wisdom to be gained thereby.

Petitioner acknowledged that she could not offer recommendations of any witnesses to support her rehabilitation. But she asserted that her credible firsthand testimony, her present business pursuits, and her deep commitment to her community should be sufficient to prove rehabilitation. We have al-

---

**19.** *See Tardiff v. State Bar,* 27 Cal.3d 395, 165 Cal.Rptr. 829, 612 P.2d 919, 923 (1980) (considering a petitioner's character in light of the shortcomings that resulted in the imposition of discipline).

ready addressed Petitioner's present pursuits: while her current employment seems well-suited to her demeanor and strengths, it does not suffice to show her competence to practice. As for her volunteer service, Petitioner did, indeed, describe her involvement in many activities that demonstrate her attachment to community—a commitment that, she said, significantly predates her misconduct. We adjudge her to be well-intentioned and sincerely interested in helping others. We applaud her efforts and hope that she continues to be active in her community. But we cannot grant her reinstatement on those bases. We must consider how, if reinstated, she might comport herself as a lawyer, not as a community volunteer.

Regrettably, considering the totality of the evidence and the testimony presented, the Hearing Board concludes that Petitioner has not proved her rehabilitation by clear and convincing evidence. We do not see a regeneration of her character, a turn-around in her perspective, or a notable difference in her approach to tackling difficult tasks. Petitioner appears to be thriving in her chosen profession, but we fear that removed from those environs she would be as unprepared to represent clients as she was in 2011 through 2013. For these reasons, we cannot find that she is unlikely to repeat her past misconduct.

## IV. *CONCLUSION*

The Hearing Board finds that, taken as a whole, Petitioner has failed to satisfy her burden of showing that she is fit to practice and that she has undergone a genuine change in character that will ensure protection of the public.[20]

**20.** *See Lawyers' Manual on Prof'l Conduct* at 101:3013 ("Throughout the [rehabilitation] inquiry runs an element of 'public qualification, i.e., that reinstatement will not be detrimental to the

## V. *ORDER*

1. The Hearing Board **DENIES** Petitioner's "Petition for Reinstatement." Petitioner **ANDREA CHRISTMAN**, attorney registration number 42796, **SHALL NOT BE REINSTATED** to the practice of law.

2. Under C.R.C.P. 251.29(i), Petitioner **SHALL** pay the costs of this proceeding. Petitioner has paid the People a $500.00 cost deposit. The People **SHALL** submit an statement of costs of this proceeding **on or before Wednesday, February 24, 2016.** Petitioner **MUST** file her response to the People's statement of costs, if any, **within seven days thereafter.** The PDJ will then issue an order establishing the amount of costs to be paid or refunded and a deadline for the payment or refund.

3. Petitioner **MUST** file any posthearing motion with the Hearing Board **on or before Wednesday, March 2, 2016.** Any response thereto **MUST** be filed **within seven days.**

4. Petitioner has the right to appeal this decision under C.R.C.P. 251.27.

5. Petitioner **SHALL NOT** petition for reinstatement within two years of the date of this order.[21]

integrity and standing of the bar, the administration of justice, or the public interest.' ").

**21.** C.R.C.P. 251.29(g).