WILLIAM R. LUCERO, PRESIDING DISCIPLINARY JUDGE
Philip M. Falco III ("Petitioner") seeks reinstatement of his law license after a nine-month suspension from the practice of law. In 2013, he pleaded guilty to attempted third-degree assault on his then-wife, who was pregnant at the time. The couple's children were nearby at the time of the assault. Petitioner's credibility and expressions of remorse were called into doubt at the disciplinary hearing, and he was required to petition for reinstatement. Petitioner has now proved by clear and convincing evidence that he is rehabilitated and has experienced a change in his character since his misconduct that makes him worthy of reinstatement to the practice of law.
I. PROCEDURAL HISTORY
On January 20, 2016, in Petitioner's underlying disciplinary case, Presiding Disciplinary Judge William R. Lucero ("the PDJ") granted a motion for judgment on the pleadings filed by Geanne R. Moroye, Office of Attorney Regulation Counsel ("the People"). A hearing on the sanctions was held before a hearing board on June 1, 2016. On July 7, 2016, that hearing board issued an "Opinion and Decision Imposing Sanctions Under C.R.C.P. 251.19(b)," suspending Petitioner's law license for nine months, with the requirement *216 that he petition for reinstatement under C.R.C.P. 251.29(c).
On September 12, 2017, Petitioner filed with the PDJ a "Verified Petition for Reinstatement After Suspension Pursuant to C.R.C.P. 251.29(c) (with Exhibits)." The People filed an answer on October 3, 2017.
At the reinstatement hearing held on January 30, 2018, the PDJ presided, and was joined by Hearing Board members E. Lee Reichert III and John E. Hayes, both lawyers. Petitioner appeared pro se, and Moroye attended on behalf of the People. The Hearing Board considered testimony from Armando Payan, Petitioner,[1] and Laurie Ann Seab. The PDJ admitted stipulated exhibits S1-S13 and Petitioner's exhibit 1. At the conclusion of the hearing, the People conceded that Petitioner should be reinstated because he met his burden of proving that he is rehabilitated, has complied with disciplinary orders and rules, and is fit to practice law.
II. FINDINGS OF FACT
The findings of fact here-aside from the section describing Petitioner's prior discipline-are drawn from testimony offered at the reinstatement hearing, where not otherwise noted. In general, the Hearing Board found the testimony offered at the reinstatement hearing to be both credible and uncontroverted.
Petitioner took the oath of admission and was admitted to practice law in Colorado on March 31, 1997, under attorney registration number 27930. He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this reinstatement proceeding.[2]
The Basis for Petitioner's Discipline
As set forth in the "Opinion and Decision Imposing Sanctions Under C.R.C.P. 251.19(b)," Petitioner's discipline was premised on his assault of his then-wife, Amber Falco, who was, at the time, twenty weeks pregnant with their fourth child.[3] On December 1, 2013, Petitioner and Ms. Falco argued in their garage while retrieving Christmas decorations.[4] After Petitioner made belittling comments to Ms. Falco, the couple went into the kitchen, near where their young children were watching a movie.[5] Ms. Falco got her phone to call 9-1-1, but Petitioner took the phone from her hand and hit her on the face.[6] She managed to get the phone and run into the bedroom to call 9-1-1, but her call did not go through.[7] Petitioner kicked in the door, pushed Ms. Falco onto the bed, and punched her in the face multiple times with a closed fist while he straddled her stomach.[8] She was able to push and kick him off her, but he grabbed her foot and pulled her off the bed.[9] The couple's children entered the bedroom.[10] Ms. Falco rushed the children from the house and drove away.[11] She later called 9-1-1.[12] The next day, she went to St. Anthony's North Hospital where she was diagnosed with a concussion.[13]
Petitioner pleaded guilty in Adams County to attempted third-degree assault, domestic violence, on February 3, 2015.[14] He was sentenced to twelve months of probation, with a domestic violence evaluation and domestic violence counseling.[15] His probation required (1) domestic violence group therapy-ninety-minute classes over the course of nine months; (2) two-hour weekly anger management *217 classes for nine months; (3) regular visits with his probation officer; and (4) random drug and alcohol EtG tests.[16] After nine months, Petitioner completed his probation. He also paid $1,474.50 in fines and costs.[17]
During the 2016 disciplinary hearing, Petitioner's testimony about the assault was deemed not to be credible, in part because it was inconsistent with testimony provided by Ms. Falco's and the sheriff deputy who responded to her 9-1-1 call.[18] The disciplinary opinion concluded that Petitioner "struck Ms. Falco with a closed fist several times" and that it was "highly implausible" that Petitioner hit her with an open hand, as he claimed during his testimony.[19] The opinion further stated that Petitioner "in subtle but numerous ways sought to minimize his own conduct and to malign Ms. Falco."[20] Given Petitioner's lack of candor and his efforts to minimize his own conduct, Petitioner was deemed not to have been "rehabilitated from the underlying issues that led to his assault upon Ms. Falco."[21]
Petitioner's conduct violated Colo. RPC 8.4(b). That rule provides that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects.[22] Petitioner's lack of remorse and refusal to take responsibility for his misconduct influenced the sanction: he was suspended for nine months with the requirement that he petition for reinstatement, if at all, under C.R.C.P. 251.29(c).[23] Petitioner's suspension took effect on August 11, 2016. After his suspension, Petitioner complied with the requirements set forth in the disciplinary opinion and the PDJ's August 2016 order of suspension.[24]
Petitioner's Reflections on His Misconduct
At his reinstatement hearing, Petitioner told the Hearing Board that he was married to Ms. Falco from 2007 to 2014. He explained that in December 2013, he was in a "really bad state" and in a "really bad relationship." He maintained that he stayed in the marriage because, as a Catholic, he did not want to divorce.
On reflection, he says, he realized that he waited "way too long" to end the marriage and, as a result, he "blew his top" and "just lost it." Petitioner attested that he failed to communicate with Ms. Falco during the marriage, allowing his anger to build up and fester. He admitted, however, that he was "completely in control" and that there was "no question that [he] was absolutely responsible for [his] own actions."
Petitioner admitted that he minimized his misconduct in the disciplinary hearing. Although he expressed concern that he might face legal consequences if he were to contradict his prior testimony, he said that he did not dispute the validity of the factual findings in the disciplinary opinion, including the finding that he struck Ms. Falco multiple times with a closed fist. There was no question in his mind, he stated, as to what happened during that assault, and he noted that it has been difficult to come to terms with the possibility that he harmed his unborn child. He acknowledged that he now must live with his actions; he said that if he could reverse time he would. He was adamant that such an assault would never happen again.
Petitioner's Personal and Professional Life
Petitioner's parents divorced when he was nine years old, and he split his time between *218 his father, who drove a cab in Manhattan, and his mother and step-father, who lived on Long Island. Petitioner attended a competitive all-boys Catholic high school, where he excelled in math and accounting. After graduating, Petitioner attended St. John's University in New York, majoring in accounting. He later became a certified public accountant ("CPA"). Petitioner attended the same university for law school and graduated in 1994. Soon thereafter, he was admitted to the New York bar.
Petitioner testified that he studied Indian law during law school and wanted to visit the Black Hills in South Dakota after graduating. So he drove to South Dakota and lived on a campground for about six weeks, immersing himself in the Sioux Indian culture. He said he was very grateful for this experience. After leaving South Dakota in 1995, Petitioner moved to Crested Butte, where he completed tax returns for "ski bums" to make ends meet.
In 1996, he took a job at Coors Brewing Company, working on a financial audit. In the next year, he accepted a position as a lawyer in a small boutique firm in Frisco, where he dabbled in many areas of law. After a year, he moved to Denver. From 1998 to 2002, Petitioner had his own tax practice and shared an office with another tax attorney. During that time, he purchased office space on the ninth floor of the historic Equitable Building in downtown Denver. He continued to manage his own law and CPA practice and served as designated counsel for the Small Business Administration until his suspension. Petitioner testified that he owns various other properties around town, including additional office space and affordable housing units in the Globeville neighborhood of Denver. Petitioner testified that he plans to remain a CPA, a business owner, and a landlord. If his license is reinstated, he would like to work on some interesting tax cases.
To maintain his professional competence during his suspension, Petitioner remained active as a CPA and completed more than eighty continuing professional educational credits ("CPE") related to that license.[25] Many of these credits transferred into continuing legal education credits ("CLE"). He also took CLE courses in ethics and professionalism, bankruptcy, and tax law.[26]
Petitioner testified that his relationship with his ex-wife is going well. They share fifty-fifty custody of their three children, and he pays Ms. Falco $1,700.00 a month in child support and maintenance. He attested that he always makes these payments on time. Laurie Ann Seab, the People's investigator, spoke with Ms. Falco, who indicated that she and Petitioner had not experienced any friction since the 2013 assault. Ms. Falco confirmed that Petitioner was current on child support and maintenance. Seab described Ms. Falco as very happy and her statements as credible.
During his suspension, Petitioner has strengthened his relationship with his three children. Petitioner stated that he is very active in his children's lives, including volunteering at their schools, attending school events, and assisting them with their Girl Scout and Boy Scout troops. Petitioner said that he has been very honest with his children about what happened in December 2013, leading to some difficult conversations about his assault on their mother.
Currently, Petitioner is engaged to be married. According to Petitioner, he has been "brutally honest" with his fiancée about the assault and told her that the July 2016 opinion had gotten "it right." In fact, he said that he encouraged his fiancée to read that opinion in an effort to fully disclose to her what had happened.
Petitioner's Efforts at Rehabilitation
Petitioner testified that he has made great strides in rehabilitating himself during his suspension. He has implemented many of the techniques that he learned in the domestic violence course and anger management training that were part of his criminal probation requirements.[27] As a result, he said, he has *219 learned to deal with mounting pressure and no longer becomes irritated or "cross" with people, as he had in the past. Becoming aware of his anger has been the biggest part of his "battle" with anger management. He testified that when something upsets him, he uses an "anger barometer" or takes a deep breath or timeout before responding. He also began practicing Buddhist meditation daily as part of his anger management training and feels that this practice has greatly lessened his anxiety and anger. He said he meditates for at least half an hour each day.
Petitioner attested that he is a changed man and that anger no longer gets the best of him. As an example, he explained that he and his fiancée recently attended his daughter's kindergarten play. He was wary that Ms. Falco wanted to speak with his fiancée after the performance. He suggested to his fiancée that they leave a few minutes early to avoid any confrontation. They did so, and when Petitioner returned home Ms. Falco texted him, upset that he had left early. Petitioner said that he did not respond to the inciting text messages because he chose not to engage with Ms. Falco.
According to Petitioner, he voluntarily sought out Dr. David Diffee's counsel during his suspension, beginning in March 2017.[28] Dr. Diffee did not testify at the hearing, but Petitioner introduced a letter that Dr. Diffee wrote in September 2017.[29] In that letter, Dr. Diffee described Petitioner in March 2017 as "frustrated and bewildered" as to the 2016 disciplinary opinion. Dr. Diffee noted that Petitioner wanted to seek "help to dig deeper into his uncharacteristic torrent of frustration, resentment, and rage."[30]
Dr. Diffee confirmed in the letter that he had met weekly with Petitioner for a few hours each time and described their meetings as "exploratory, pointed, and difficult."[31] Dr. Diffee explained that they did not rehash the history of the assault but rather focused on how Petitioner "deteriorate[d] into a batterer" by asking very specific and difficult questions.[32] Dr. Diffee thought Petitioner worked very hard to seek a broader self-understanding and to use tools to change. He opined that Petitioner had "taken to this very hard work with an uncommon enthusiasm" and "developed new insights and self-perceptions."[33] Dr. Diffee found that Petitioner "fully acknowledge[d] his actions were inappropriate and hurtful to all concerned" and "violated the very [tenets] of his profession."[34] Dr. Diffee concluded that Petitioner accepted "that the impulsive use of violence is never appropriate" and "that there are always much better alternatives."[35] It was Dr. Diffee's opinion that Petitioner "entirely acknowledges his culpability and is fully rehabilitated."[36]
Petitioner maintains that he will continue to see Dr. Diffee for therapy, although he wants to switch from weekly to bimonthly sessions. He would also like to begin family therapy with his children. Petitioner believes that his weekly therapy sessions and meditation practice contributed to the change in his character.
Petitioner's Community Service
Petitioner has spent many hours volunteering during his suspension. He and his colleague Armando Payan have worked together on various projects in the Denver Globeville neighborhood-a low-income community-for many years before and after his suspension. Payan testified that he has known Petitioner for more than twenty *220 years. According to Payan, he and Petitioner have frequently spent time with Globeville residents on community projects and have expended great effort to turn the neighborhood elementary school from a low-performing school into one of the top-performing schools in the district. Payan noted that Petitioner helped plant an orchard on the school grounds, hosted several fundraisers for the school, and encouraged community members to volunteer within the neighborhood. Payan stated that Petitioner also purchased residential property in that neighborhood, which he turned into affordable housing. Finding volunteers in Globeville is difficult, said Payan, but Petitioner is always willing to help, even though he does not live there. Payan estimated that Petitioner has dedicated more than 100 hours per year over the past two decades volunteering in Globeville. As a result, Payan testified, Petitioner has a great reputation in that community. Payan finds Petitioner to be very honest. Since Petitioner's suspension, Payan has observed that Petitioner is more compassionate than he was before. For example, he recently witnessed Petitioner taking the extra step to diffuse tension among residents and city council members at a public hearing.
Petitioner testified that he is committed to bettering Globeville because he has always appreciated the community and its residents. He first bought property, which he still owns, in that neighborhood in 1997. He also lived in Globeville while going through his divorce from Ms. Falco. In addition to the work Payan described, Petitioner has helped Globeville residents to build a house, including by laying the foundation.
Petitioner also explained that Globeville will likely be negatively affected by the diversion of flood waters as part of the Interstate I-70 expansion efforts because the neighborhood sits in a flood plain. Recently, Petitioner was appointed by Denver's mayor to serve on the Globeville Storm Water Study Committee, which is tasked with making recommendations to the city about how stormwater drainage affects the community. Petitioner wants to continue volunteering in Globeville and hosting fundraisers for the elementary school. Petitioner also wants to assist Globeville residents with various legal issues if his law license is reinstated.
III. LEGAL ANALYSIS
In order to be reinstated to the Colorado bar under C.R.C.P. 251.29(c), an attorney must prove by clear and convincing evidence that the attorney has complied with applicable disciplinary orders and rules, is fit to practice law, and has been rehabilitated.[37] To be reinstated, a petitioner must establish that he or she possesses all of the qualifications required of applicants admitted to practice law in Colorado.[38]
Compliance with Disciplinary Orders and Rules
Under C.R.C.P. 251.29(c)(4), an attorney petitioning for reinstatement must show compliance with all disciplinary orders and rules. Petitioner avers that he has complied with all provisions of the July 2016 disciplinary opinion, his August 2016 order of suspension, and with all rules governing suspended lawyers. The People do not object to Petitioner's reinstatement on these grounds, and the Hearing Board has no reason to question Petitioner's compliance.
Fitness to Practice Law
We next examine whether Petitioner is fit to practice law. The People do not dispute that Petitioner maintained his professional competence during his suspension. He completed numerous CPEs and CLEs, including courses on ethics, bankruptcy, and tax law. He also remained working as a CPA, keeping him apprised of current tax issues. Accordingly, the Hearing Board finds clear and convincing evidence that Petitioner is fit to practice law.
Rehabilitation
Finally, the Hearing Board is responsible for reviewing whether Petitioner has been *221 rehabilitated from the factors giving rise to his misconduct. We cannot grant reinstatement simply upon a showing that Petitioner has engaged in proper conduct or refrained from further misconduct during his suspension.[39] In assessing Petitioner's rehabilitation, we consider the seriousness of his original discipline[40] and whether he has experienced a change in his state of mind.[41] In this analysis, we are guided by the leading case of People v. Klein , which enumerates several criteria for evaluating rehabilitation: character; conduct since the imposition of the original discipline; professional competence; candor and sincerity; recommendations of other witnesses; present business pursuits; community service and personal aspects of the petitioner's life; and recognition of the seriousness of the previous misconduct.[42] The Klein criteria provide a framework to assess the likelihood that Petitioner will repeat his prior misconduct.
We begin by examining whether Petitioner has addressed his shortcomings, because the imposition of discipline is necessarily predicated upon a finding of some shortcoming, whether it be a personal or professional deficit.[43] We do so by first reviewing the misconduct that led to Petitioner's suspension.[44] Petitioner's discipline was premised on his third-degree assault in December 2013 on his pregnant wife. His testimony at the disciplinary hearing was found to be less than candid, riddled with numerous efforts to minimize his own conduct and to blame Ms. Falco. Petitioner's misconduct thus stemmed from personal deficiencies.
We find Petitioner credible in his assessment that he can now manage his anger. We commend his efforts to avoid challenging situations that in the past might have led him to react inappropriately. Petitioner testified that he no longer "gets cross" with others and does not respond to inciting texts or encounters. He is able to do so, in part, because he uses tools such as an anger barometer to gauge the level of his anger, breathing exercises to calm down, or a time out before responding to an intense situation. We also believe that Petitioner's focus on mindfulness and mediation has assisted him with managing his anger and anxiety. It appears that Petitioner is now aware of his anger and has taken substantial steps to manage that anger and to avoid a loss of control.
Petitioner's other self-discovery efforts are admirable. He has confronted and explored his character flaws with Dr. Diffee in an effort to learn why he assaulted his ex-wife. He has worked hard with Dr. Diffee to seek a broader understanding of himself. It is important to us that Petitioner voluntarily sought out weekly therapy with Dr. Diffee to better himself, and we find credible his attestation that he will remain in therapy for the *222 indefinite future, and pursue family counseling with his children.
Although it would have been helpful to have the benefit of Dr. Diffee's testimony at the hearing, the People stipulated to the introduction of the letter Dr. Diffee wrote in September 2017, based on his treatment of Petitioner that same year. In the letter, Dr. Diffee commented on Petitioner's reflections about his misconduct, as well as his own observations that Petitioner worked hard to gain a broader understanding of himself, that he "fully acknowledges his actions were inappropriate and hurtful to all" involved, that he understands "impulsive use of violence is never appropriate," and that "he entirely acknowledges his culpability and is fully rehabilitated."[45] Dr. Diffee's letter offers strong evidence that Petitioner has transformed since the assault in 2013.
Additionally, we give weight to Ms. Falco's assurances to the People that she has experienced no further discord with Petitioner since the 2013 assault. Over four years have passed since the assault and it seems that since then, Petitioner and Ms. Falco have amicably shared joint custody of their three children with no issues.
Petitioner has maintained his professional competence throughout his suspension, and we appreciate his substantial volunteer efforts in the Globeville community. He described his involvement in many activities benefiting that neighborhood, including his fundraising efforts for the local elementary school and his service on the storm water drainage committee. Payan testified as to Petitioner's good character, corroborated his extensive service efforts, and spoke of Petitioner's valued reputation in the community for good will and honesty. We consider Petitioner to be well-meaning and eager to remain active as a volunteer in that neighborhood. He also appeared to be engaged as a father, spending a great deal of time with his three children while contributing to their classroom and enrichment activities. We applaud these personal and community service aspects of Petitioner's life.
Overall, we found Petitioner to be candid and credible during the hearing. He did not attempt to minimize his misconduct or to blame Ms. Falco. He answered some difficult questions posed by the Hearing Board, including by stating that he did not dispute any of the factual findings made in the 2016 disciplinary opinion. He took full responsibility for his actions in December 2013. He blamed himself for not leaving his marriage sooner, for failing to communicate with Ms. Falco, and for allowing his anger to build up to the point that he "lost it." At no point did he shirk responsibility for the assault. We also find Petitioner's evaluation of his misconduct to be sincere, and his acceptance of responsibility for his wrongdoing demonstrates his rehabilitation. He made credible statements that he has had tough conversations with his children about the assault and that he told his fiancée to read the July 2016 disciplinary opinion. Petitioner also appeared to be genuinely remorseful for his misconduct and realized the injuries he caused, in particular those he might have caused to his unborn child. We further recognize that Petitioner has not been subject to other disciplinary actions since his misconduct.[46]
The evidence presented by Petitioner gives us confidence that he is now able to manage his anger and anxiety so that he can have productive interactions with others and avoids confrontations. Thus, we are convinced that he has overcome the personal deficits that triggered his misconduct in 2013. The purpose of the attorney regulation system is not to punish lawyers but to protect the public while allowing for the possibility of a lawyer's rehabilitation.[47] Considering the totality of the evidence and testimony presented, the Hearing Board concludes that Petitioner has proved his rehabilitation by clear and convincing evidence.
*223 IV. CONCLUSION
Petitioner has established clearly and convincingly that he has complied with applicable court orders and rules, is fit to practice law in Colorado, and has been rehabilitated. Although the rule violation that led to Petitioner's suspension was serious, he has sufficiently addressed the shortcomings that led to his misconduct. Accordingly, Petitioner should be reinstated to the practice of law.
V. ORDER
1. The Hearing Board GRANTS Petitioner's "Verified Petition for Reinstatement After Suspension Pursuant to C.R.C.P. 251.29(c) (with Exhibits)." Petitioner PHILIP M. FALCO III , attorney registration number 27930, is REINSTATED to the practice of law, effective immediately.
2. Under C.R.C.P. 251.29(i), Petitioner SHALL pay the costs of this proceeding. The People SHALL submit a statement of costs on or before Tuesday, March 20, 2018 . Petitioner MUST file his response, if any, within seven days thereafter . The PDJ will then issue an order establishing the amount of costs to be paid or refunded and a deadline for the payment or refund.
3. Any posthearing motion MUST be filed with the Hearing Board on or before Tuesday, March 27, 2018 . Any response thereto MUST be filed within seven days .
/s/ Originally signed
E. LEE REICHERT III
HEARING BOARD MEMBER
/s/ Originally signed
JOHN E. HAYES
HEARING BOARD MEMBER

The PDJ suppressed a portion of Petitioner's testimony during the hearing.

See C.R.C.P. 251.1(b).

Op. at 216.

Op. at 216.

Op. at 216.

Op. at 216.

Op. at 216.

Op. at 216.

Op. at 216.

Op. at 216.

Op. at 216.

Op. at 216.

Op. at 216.

Op. at 215-16.

Op. at 215-16.

Op. at 215-16.

Op. at 215-16.

Op. at 217-18.

Op. at 218-19.

Op. at 217-19.

Op. at 218-19.

Colo. RPC 8.4(b). Petitioner's conduct was also grounds for discipline under C.R.C.P. 251.5(b), which states that any criminal act reflecting adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects is grounds for discipline.

Op. at 223.

See Exs. 1 and S10-S11.

See Exs. S6-S8.

See Exs. S6-S8.

See Exs. S3-S5. Although not presented as evidence during the hearing, we note that the People also stated in their hearing brief that they spoke with Petitioner's probation officer, who reported that Petitioner did not have any problem complying with his probationary terms. He completed all of the classes, never had a positive EtG, and paid all costs and fines.

In July 2016, Dr. Diffee also completed a full psychological examination of Petitioner for use in the underlying disciplinary case. See Ex. S1.

Ex. S1.

Ex. S1 at 1.

Ex. S1 at 1.

Ex. S1 at 1.

Ex. S1 at 2.

Ex. S1 at 2.

Ex. S1 at 2.

Ex. S1 at 2.

C.R.C.P. 251.29(b).

C.R.C.P. 251.29(b)(3) ; C.R.C.P. 208.1(5)(a)-(j) (listing essential eligibility requirements for admittance to practice law in Colorado).

See C.R.C.P. 251.29(c)(3).

See Lawyers' Manual on Prof'l Conduct (ABA/BNA) 101:3013 (2012) ("Examination of a lawyer's rehabilitation and fitness begins with a review of the seriousness of the original offense....").

See In re Cantrell, 785 P.2d 312, 313 (Okla. 1989) ; In re Sharpe , 499 P.2d 406, 409 (Okla. 1972).

756 P.2d 1013, 1015-16 (Colo. 1988) (interpreting language of C.R.C.P. 241.22, which embodied an earlier version of the rule governing reinstatement to the bar). We note that the Klein decision relies upon an earlier version of the Lawyers' Manual on Professional Conduct (ABA/BNA) 101:3005, which listed the above factors for assessing the rehabilitation of lawyers seeking reinstatement. The current version of the manual sets forth a number of other factors to consider when evaluating a lawyer's rehabilitation: the seriousness of the original offense, conduct since being disbarred or suspended, acceptance of responsibility, remorse, how much time has elapsed, restitution for any financial injury, maintenance of requisite legal abilities, and the circumstances of the original misconduct, including the same mitigating factors that were considered the first time around. Id . at 101:3013. While some of these newly articulated factors are encompassed in our analysis, we do not explicitly rely on them as guideposts for our decision.

See Tardiff v. State Bar , 27 Cal.3d 395, 165 Cal.Rptr. 829, 612 P.2d 919, 923 (1980) (considering a petitioner's character in light of the shortcomings that resulted in the imposition of discipline).

See C.R.C.P. 251.29(e) ("In deciding whether to grant or deny the petition, the Hearing Board shall consider the attorney's past disciplinary record.").

Ex. S1 at 2.

C.R.C.P. 251.29(e).

In re Cardwell , 50 P.3d 897, 904 (Colo. 2002) ; see also In re Price , 18 P.3d 185, 192 (Colo. 2001) (noting that disciplinary proceedings are not punishment, nor are reinstatement proceedings intended as discipline).